Eleanor M. DARLING

v.

AUGUSTA MENTAL HEALTH INSTITUTE et al.

Supreme Judicial Court of Maine.

Argued Nov. 6, 1987.
Decided Dec. 22, 1987.

**422**

Francis M. Jackson (orally), Jackson & Pallas, Westbrook, for plaintiff.

Stephen C. Whiting (orally), Hewes, Douglas, Whiting & Quinn, Portland, for Joyce & Kerwin.

James E. Tierney, Atty. Gen., Linda Sibery Crawford (orally), Asst. Atty. Gen., Augusta, for A.M.H.I., et al.

Before McKUSICK, C.J., and NICHOLS, ROBERTS, WATHEN, SCOLNIK and CLIFFORD, JJ.

McKUSICK, Chief Justice.

Plaintiff Eleanor Darling, personal representative of the estate of her son Frank Darling, appeals to this court the dismissal of her claims arising out of the murder by her son of his wife after he was discharged from the Augusta Mental Health Institute (AMHI) and then his suicide while an inmate in the Cumberland County jail. In Superior Court (Cumberland County) plaintiff sued AMHI, the Commissioner of the Department of Mental Health and Mental Retardation, the Superintendent of AMHI, various AMHI employees, and Cumberland County Sheriff Martin Joyce and Deputy Sheriff Douglas Kerwin, on both state tort claims and federal claims under 42 U.S. C.A. § 1983 (1981). The Superior Court, in a succession of dismissal orders and summary judgments, held for defendants on all these claims. We vacate only the order entering summary judgment in favor of Deputy Sheriff Kerwin on the section 1983 claim, but affirm the Superior Court in all other respects.

I.

On October 20, 1981, while incarcerated at Cumberland County jail for assaulting his wife, Frank Darling was taken to Maine Medical Center (MMC) for examination because of his strange behavior at the jail. A physician at MMC certified Darling for involuntary admission at AMHI, and he was transferred there. On the next day, October 21, 1981, AMHI psychiatrist Ulrich Jacobsohn examined Darling and determined that he "show[ed] no evidence of major mental illness" and could not be detained at AMHI on an involuntary basis. Assisting Dr. Jacobsohn in his evaluation of Darling were Robert Lamoreau, a mental health worker; Adrienne Nadeau, also a mental health worker; and Dr. Charles Acker, a psychologist. At his request Darling was then returned to the Cumberland County jail and shortly thereafter was released on bail.

On November 5, 1981, Darling again attacked his wife, this time killing her. In his bifurcated trial for murder, the jury returned a guilty verdict in the first phase;

but on July 4, 1982, while in Cumberland County jail awaiting trial of his insanity defense, he hanged himself. Before the suicide Sheriff Joyce, concerned about Darling's mental and physical condition, had ordered him placed under a one-on-one continuous observation. Sheriff Joyce assigned Deputy Sheriff Kerwin to perform the observation, but at the time when the suicide occurred Kerwin was busy in the vicinity of Darling's cell assisting other guards in the strip search of another inmate.

Earlier, on November 13, 1981, soon after he killed his wife, Darling had filed with the Attorney General notice pursuant to the Maine Tort Claims Act, 14 M.R.S.A. § 8107 (1980), of a claim against AMHI, Commissioner Concannon, Superintendent Mullaney, and various AMHI employees for allowing Darling to leave that institution. On October 20, 1983, just short of two years following Darling's discharge from AMHI, his mother as his personal representative filed with the Superior Court (Cumberland County) a complaint against those same parties alleging negligence and a 42 U.S.C.A. § 1983 violation of Darling's constitutional rights arising out of his discharge.[1] The complaint alleged that the named AMHI staff negligently diagnosed and treated Darling and by discharging him failed to ensure that he would not be a threat to himself and others. The complaint also alleged that AMHI, Commissioner Concannon, and Superintendent Mullaney failed to train their staff adequately and to promulgate appropriate procedures for dealing with patients like Darling. Dr. Jacobsohn was not named in the original complaint, but on October 18, 1983, plaintiff had notified him pursuant to 24 M.R.S.A. § 2903 (Supp.1984) of a claim against him. On January 13, 1984, plaintiff then amended her complaint to add Dr. Jacobsohn as a defendant. Later, the Superior Court allowed plaintiff again to amend her complaint, this time to add as defendants Sheriff Joyce and Deputy Sheriff Kerwin (then named only as "Doe").

The Superior Court in June 1984 dismissed all the claims against AMHI, Mullaney, Concannon, and the AMHI employees who had participated in the team assessment of Darling, and granted summary judgment in favor of Dr. Jacobsohn and Dr. Acker. In November 1985 the court granted summary judgment in favor of Sheriff Joyce and Deputy Sheriff Kerwin on the state law claims, and in November 1986 on the federal section 1983 claim. Plaintiff then filed a timely appeal to this court.

## II.

### State law claims against AMHI

 The Superior Court properly dismissed plaintiff's negligence claim against AMHI based upon the broad immunity provided governmental entities under the Maine Tort Claims Act, 14 M.R.S.A. § 8103(1) (1980). The Act defines "governmental entity" to include the State and its political subdivisions, id. § 8102(2), and in turn defines the "State" to include

any office, department, agency, authority, commission, board, institution, hospital or other instrumentality thereof....

Id. § 8102(4) (Supp.1987).[2] Since AMHI is a mental hospital created by statute and maintained by the State, 34 M.R.S.A. § 2101 (1978), it enjoys the broad general immunity provided by the Tort Claims Act.

Plaintiff contends, however, that the Tort Claims Act does not prevent her from pursuing her claim against AMHI because the maintenance of a mental hospital con-

---

**1.** Plaintiff has not properly perfected her appeal from the rejection of her section 1983 claims against these parties. Her principal brief presented no argument relative to those claims. See Chadwick–BaRoss, Inc. v. Martin Marietta Corp., 483 A.2d 711, 717 (Me.1984). See also M.R.Civ.P. 75A(c) (reply brief "must be strictly confined to replying to new matter raised in the brief of the appellee").

**2.** Although the legislature has amended the Tort Claims Act a number of times since the October 1981 decision not to keep Darling at AMHI, we refer here only to those statutory provisions governing the scope of immunity in effect at the time of that decision.

stitutes a proprietary activity qualifying for Maine's former common law exception to sovereign immunity. *See, e.g., Blier v. Town of Fort Kent,* 273 A.2d 732, 733–34 (Me.1971); *Anderson v. City of Portland,* 130 Me. 214, 216, 154 A. 572, 573 (1931). We reject this contention because the Maine Tort Claims Act has in this state entirely displaced the common law of sovereign immunity, including any exceptions to immunity.

Following our abolition of the common law doctrine of sovereign immunity, *Davies v. City of Bath,* 364 A.2d 1269, 1273 (Me. 1976), the legislature quickly enacted the Tort Claims Act, thereby creating a new statutory immunity for governmental entities, 14 M.R.S.A. § 8103(1), subject to a number of specific, limited exceptions, *id.* § 8104. The Act makes clear, both in its comprehensive scope and in its explicit wording, that it has supplanted any remnants of Maine's common law of sovereign immunity that may still have existed. The Act provides:

> **Immunity.** *Except as otherwise expressly provided by statute,* all governmental entities shall be immune from suit on any and all tort claims seeking recovery of damages. When immunity is removed by this chapter, any claim for damages shall be brought in accordance with the terms of this chapter.

*Id.* § 8103(1) (emphasis added). There can be no doubt that the legislature meant to limit the governmental immunity exceptions to those explicitly set forth by statute. Since the "proprietary activity" exception to sovereign immunity has its source solely in the common law, *Blier v. Town of Fort Kent,* 273 A.2d at 735–36, that exception has been abrogated by the Tort Claims Act. The Act confines plaintiff to Maine's statutory law for any possible exceptions to the State's general immunity from suit. *See Young v. Greater Portland Transit Dist.,* 535 A.2d 417 (Me. 1987).

There is no merit in plaintiff's alternative contention that AMHI's conduct at issue here falls within the Act's exception to governmental immunity for injuries arising out of "the construction, operation, or maintenance of any public building or the appurtenances thereto...." 14 M.R.S.A. § 8104(2). Courts strictly construe any exception to governmental tort claims immunity. *Clockedile v. State Dept. of Transp.,* 437 A.2d 187, 189 (Me.1981). Plaintiff alleges only that AMHI has negligently promulgated procedures for diagnosing and retaining patients and has negligently trained its personnel involved in such diagnoses. Under no reasonable analysis would AMHI's alleged wrongful training and promulgation of rules constitute the operation of a public building. *Cf.* 34 M.R.S.A. § 1 (1978) (distinguishing mental health department's authority to manage and control "buildings and property" from its authority to care for "patients and inmates").[3]

### III.

### *State law claims against state employees*

The Superior Court dismissed plaintiff's state law claims against Commissioner Concannon and Superintendent Mullaney because of the personal immunity provided by the Tort Claims Act to government employees performing discretionary functions within the scope of their employment. 14 M.R.S.A. § 8111(1)(C). The court entered summary judgment in favor of Dr. Jacobsohn on the ground that her claim was barred by the governing two-year statute of limitations. Finally, the court dismissed the claims against the other AMHI employees because Dr. Jacobsohn himself was the clinician entrusted with the authority to determine Darling's status, thus freeing the other participants in this decision from any liability for its consequences. We affirm the Superior Court's judgment in re-

---

**3.** There is likewise no merit whatever in plaintiff's argument that the Act provides at 14 M.R.S.A. § 8104(5) (1980) a general exception to immunity in any and all wrongful death actions. Subsection (5) does nothing more than set forth the procedural requirements a plaintiff must meet when he brings a wrongful death claim that falls within the exceptions granted in the preceding subsections.

gard to all these employees, but rest our affirmance in each case upon the discretionary function immunity provided by section 8111(1)(C).

### A. *Commissioner Concannon and Superintendent Mullaney*

■ In October 1981 when this claim arose, Commissioner Concannon was charged by statute with overseeing the Department of Mental Health and Mental Retardation [4] as well as AMHI, a mental hospital operated by the department. 34 M.R. S.A. §§ 1, 2 (1978).[5] The department has authority to promulgate rules relating to residents at AMHI, *id.* § 7(1), and Superintendent Mullaney was charged with running the hospital subject to the department's regulations, *id.* §§ 2102–2103. Plaintiff's complaint alleged that Commissioner Concannon and Superintendent Mullaney negligently performed these statutory responsibilities in that:

(a) They failed to adequately train, supervise and control the Superintendent and staff at the Augusta Mental Health Institute; [and]

(b) They failed to promulgate and maintain necessary and appropriate procedures for the diagnosis, retention and treatment of patients who were known risks to others and to themselves.

Defendants assert that their actions in supervising personnel and promulgating diagnosis procedures fall within the discretionary function immunity of the Tort Claims Act. We agree.

The Maine Tort Claims Act provides a discretionary function immunity to government employees for conduct within the scope of their employment:

4. At the time this claim arose, the present Department of Mental Health and Mental Retardation was named the Department of Mental Health and Corrections. *See* 34 M.R.S.A. § 1 (1978) (repealed and replaced by 34–B M.R.S.A. § 1201 (Pamph.1986)).

5. In 1984 the legislature repealed title 34 and replaced it with title 34–B. *See* P.L.1983, ch. 459, §§ 5, 7 (eff. Jan. 15, 1984). We refer here to the statutory provisions that governed de-

1. **Immunity.** Employees of governmental entities shall be personally immune from civil liability for the following:

. . . .

C. The performance or failure to exercise or perform a discretionary function or duty, whether or not the discretion is abused; and whether or not the statute, charter, ordinance, order, resolution, regulations or resolve under which the discretionary function or duty is performed is valid.

14 M.R.S.A. § 8111(1)(C). This immunity insulates from personal liability a government employee who has been legislatively authorized to perform some discretionary function and "has acted, or has failed to act, pursuant to that authorization." *True v. Ladner,* 513 A.2d 257, 260 (Me.1986).[6]

The *Restatement (Second) of Torts* § 895D comment b (1979) describes as follows the purpose of the discretionary function immunity:

The basis of the immunity has been not so much a desire to protect an erring officer as it has been a recognition of the need of preserving independence of action without deterrence or intimidation by the fear of personal liability and vexatious suits.... [T]ort liability should not be imposed for conduct of a type for which the imposition of liability would substantially impair the effective performance of a discretionary function.

*See also id.* comment d. The United States Supreme Court has stated that the discretionary function immunity in the federal tort claims act

includes more than the initiation of programs and activities. It also includes determinations made by executives or administrators in establishing plans, speci-

fendants' conduct in this action when the claim arose.

6. Compare *MacKerron v. Madura,* 474 A.2d 166, 167 (Me.1984), where we held that the discretionary function immunity would not protect a police officer who intentionally harms another party. *Cf. also Kane v. Anderson,* 509 A.2d 656, 656–57 (Me.1986) (execution of an arrest warrant is a ministerial as opposed to a discretionary function).

fications or schedules of operations. Where there is room for policy judgment and decision there is discretion. It necessarily follows that acts of subordinates in carrying out the operations of government in accordance with official directions cannot be actionable.

*Dalehite v. United States,* 346 U.S. 15, 35–36, 73 S.Ct. 956, 968, 97 L.Ed. 1427 (1953). A number of state high courts have considered the following four factors in determining whether the governmental action at issue constitutes a discretionary function:

> (1) Does the challenged act, omission, or decision necessarily involve a basic governmental policy, program or objective? (2) Is the questioned act, omission, or decision essential to the realization or accomplishment of that policy, program, or objective as opposed to one which would not change the course or direction of the policy, program, or objective? (3) Does the act, omission, or decision require the exercise of basic policy evaluation, judgment, and expertise on the part of the governmental agency involved? (4) Does the governmental agency involved possess the requisite constitutional, statutory, or lawful authority and duty to do or make the challenged act, omission, or decision?

*Trianon Park Condominium Assoc. v. City of Hialeah,* 468 So.2d 912, 918 (Fla. 1985) (quoting *Evangelical United Brethren Church of Adna v. State,* 67 Wash.2d 246, 255, 407 P.2d 440, 445 (1965)).

Guided by the above considerations we have no hesitation in determining that the alleged misconduct of Commissioner Concannon and Superintendent Mullaney falls within Maine's discretionary function immunity. The essence of plaintiff's claim against them is that they negligently devised and oversaw AMHI's policies governing the commitment and release of patients posing a potential threat to themselves and the community. Clearly such policymaking and supervisory conduct is at the core of the discretionary function immunity. At the very least the purpose of this immunity is to insulate from the fear of "vexatious suits" state officials charged by statute

with devising and implementing general policies. A refusal to recognize such an immunity for officials with such responsibilities would seriously compromise the "independence of action" necessary for the effective management of state government. *Restatement (Second) of Torts* § 895D comment b. *See Dalehite v. United States,* 346 U.S. at 37, 73 S.Ct. at 969 (decision to institute fertilizer export program was a discretionary act); *Payton v. United States,* 679 F.2d 475, 480 (5th Cir. 1982) (decision by parole board to grant or deny parole is discretionary function); *Blessing v. United States,* 447 F.Supp. 1160, 1170 (E.D.Pa.1978) (discretionary functions are manifestations of policy judgments); *Doe v. Arguelles,* 716 P.2d 279, 282 (Utah 1985) (decision by superintendent of state youth detention center to allow placement of disturbed youth out in the community "fell into the category of functions designed to be shielded under the discretionary function exception").

### B. *Dr. Jacobsohn*

■ As a preliminary matter we reject the Superior Court's holding, upon which the court premised its entry of summary judgment for Dr. Jacobsohn, that plaintiff's suit against him was barred by the two-year statute of limitations. Dr. Jacobsohn signed the order terminating Darling's involuntary status at AMHI on October 21, 1981. Plaintiff did not add Dr. Jacobsohn to the complaint for his allegedly negligent decision until January 13, 1984, more than two years after any cause of action against him accrued and therefore beyond the two-year limitations period relied on by the Superior Court. 14 M.R.S.A. § 8110. Plaintiff argues, however, that under the Maine Health Security Act, 24 M.R.S.A. § 2903 (Supp.1984), she tolled the running of the limitations period for 90 days by notifying Dr. Jacobsohn of her claim within the two-year period. Since that notice was in fact given on October 19, 1983, plaintiff continues, the limitations period was tolled and her complaint against Dr. Jacobsohn was timely filed. Defendant counters, and the Superior Court agreed, that plaintiff

failed to serve the notice of a claim in the manner prescribed by the Health Security Act, making that notice invalid and thereby preventing any tolling of the statute of limitations. We reject defendant's counterargument because plaintiff did give proper notice to Dr. Jacobsohn under 24 M.R.S.A. § 2903 and therefore did toll the limitations period.

Section 2903 of the Maine Health Security Act provides:

No action for death or injuries to the person arising from any medical, surgical or dental treatment, omission or operation shall be commenced until at least 90 days after written notice of claim setting forth under oath the nature and circumstances of the injuries and damages alleged is served personally or by registered or certified mail upon the person or persons accused of wrongdoing. Any applicable statute of limitations shall be tolled for a period of 90 days from service of notice.

24 M.R.S.A. § 2903. On October 19, 1983, plaintiff by certified mail sent to Dr. Jacobsohn a notice fully stating her claim that he had acted negligently by terminating Darling's involuntary status at AMHI. Defendant contends, however, that plaintiff did not meet the requirement that notice be "served personally or by registered or certified mail *upon the person* or persons accused of wrongdoing," *id.*, because Dr. Jacobsohn did not personally sign the certified mail receipt. We disagree. Plaintiff did send notice to Dr. Jacobsohn by certified mail as required by statute, and in any event, even if a technical violation of section 2903 did occur, it in no way prejudiced the doctor, who by regular operating procedures in fact received the notice within hours of its receipt at AMHI, his place of business. *Cf. Michaud v. Northern Maine Medical Center,* 436 A.2d 398, 402 (Me. 1981) (after balancing the equities, court disregarded nonprejudicial failure to comply strictly with notice requirements of section 2903).

■ Thus the Superior Court's rationale for entry of summary judgment for Dr. Jacobsohn does not survive appellate review. Nevertheless, we affirm the Superior Court's summary judgment order for another reason: Dr. Jacobsohn's decision not to maintain Darling's involuntary status at AMHI constitutes a discretionary function, immune from suit under the Tort Claims Act. Whether the allegedly wrongful conduct was a discretionary function depends upon the actual conduct at issue and its relationship to the performance of some legislatively imposed duty. Here, because Dr. Jacobsohn was fulfilling his statutory responsibility of determining Darling's status at AMHI, and because that determination itself plays a central role in the State's involuntary commitment procedures, Dr. Jacobsohn's conduct was the kind that the Tort Claims Act insulates from suit through the discretionary function immunity.

Although the complaint alleges not only that Dr. Jacobsohn negligently diagnosed but also that he negligently treated Darling, the doctor's affidavits as well as the statutes under which he was acting in regard to Darling make clear that during the relevant time Dr. Jacobsohn and the AMHI team assisting him were engaged solely in diagnosing Darling to decide whether under the controlling statute he should be kept at AMHI involuntarily. Therefore we are not presented with a question whether negligent medical treatment by a state employee falls within the discretionary function immunity. *Cf. Payton v. United States,* 679 F.2d at 480–81 (distinguishing under discretionary function immunity a negligent decision to release from negligent medical treatment); *Doe v. Arguelles,* 716 P.2d at 283 (distinguishing decision to release psychiatric patient from duty to monitor prescribed treatment).

When he examined Darling shortly after admission at AMHI, Dr. Jacobsohn was performing a statutory duty set out in 34 M.R.S.A. § 2372 (1978):

**Medical examination of new patients**

Every patient admitted to a hospital shall be examined as soon as practicable after his admission.

The head of the hospital shall arrange for examination by a staff physician or

clinical psychologist of every patient hospitalized pursuant to section 2333. . . . If such an examination is not held within 24 hours after the time of admission, or if a staff physician or clinical psychologist fails or refuses after such examination to certify that in his opinion the patient is a mentally ill individual and due to his mental illness poses a likelihood of serious harm ..., the patient shall be immediately discharged.

Since Dr. Jacobsohn in the exercise of his professional judgment rejected the conclusion that Darling was "a mentally ill individual and due to his mental illness [he] pose[d] a likelihood of serious harm," Darling's initial involuntary status ended and he chose to return to the Cumberland County jail.

The discretionary nature of Dr. Jacobsohn's section 2372 determination is demonstrated by its critical position in the statutorily prescribed process for involuntary commitment of mental patients.[7] A person can be admitted to a state mental hospital on an emergency basis when a health or police officer together with a licensed physician or psychologist certified that the individual was mentally ill and posed a likelihood of serious harm to himself or the community, and a judge or complaint justice endorsed that certification. 34 M.R.S. A. § 2333(1) (1978). Once a person was involuntarily admitted, section 2372 required within 24 hours certification by a physician or psychologist at the hospital that the person was mentally ill and posed a threat to himself or the community. *Id.* § 2372. The latter step was the one performed by Dr. Jacobsohn relative to Darling. If within 5 days after the initial admission the head of the hospital believed further hospitalization was needed, he would have to petition the District Court for a commitment order. *Id.* § 2333(2)(B). The court would then order additional examinations by two physicians or psychologists who both would have to determine for commitment to continue that the patient

was mentally ill and a threat to the community. *Id.* § 2334(3)(A)–(C). If they should make that determination the court would then hold a hearing and could issue an involuntary commitment order only if it found by clear and convincing evidence that the patient was mentally ill, a threat to himself and the community, and that in-patient hospitalization and the individual treatment plan offered by the hospital would be the best available treatment for the individual. *Id.* § 2334(5)(A).

Thus Dr. Jacobsohn's determination whether Darling was mentally ill and posed a likelihood of serious harm was the critical threshold step in the governmental decision whether Darling continued in involuntary commitment at AMHI. Exercising a professional judgment upon that initial commitment question, central to effecting the State's important responsibilities of protecting the public and treating the mentally ill, is a discretionary function and Dr. Jacobsohn is immune from suit under the Tort Claims Act for any alleged negligence in carrying it out.

Other courts have reached results similar to ours today. *See Payton v. United States,* 679 F.2d at 480–81 (decision by parole board to grant or deny parole is discretionary function immune under federal tort claims act); *Reddish v. Smith,* 468 So.2d 929, 931 (Fla.1985) (decision to alter prisoner from "medium" to "minimum custody status" is a discretionary function protected by state's sovereign immunity doctrine); *Cairl v. State,* 323 N.W.2d 20, 23 (Minn. 1982) (decision to release inmate from state mental facility is a discretionary function for which state and state employees cannot be sued); *Sherrill v. Wilson,* 653 S.W.2d 661, 664–65 (Mo.1983) (duty of state physicians to determine "detention and temporary or permanent release of patients" is discretionary activity and should be "unencumbered and unfettered, at least as against negligence claims"); *Doe v. Arguelles,* 716 P.2d at 282 ("decision to release,

---

7. The statutory process for the involuntary commitment of mental patients outlined here is that which was in effect in October 1981, 34 M.R.S. A. §§ 2333–2334, 2372 (1978), but that process remains substantially unchanged after subsequent amendments. *See* 34–B M.R.S.A. §§ 3863–3864 (Pamph.1986).

parole, or put on probation criminal defendants, juvenile delinquents, or mental patients is a decision of a judgment, planning, or policy nature"). The Minnesota Supreme Court stated the rationale supporting application of the discretionary immunity of its tort claims act in the circumstances we face in the case at bar:

> If release decisions were exposed to the threat of liability those individuals charged with rendering those decisions would likely become unduly responsive to one consideration—the cost of liability. Moreover, the threat of liability would undermine a statewide policy favoring open door treatment rather than custodial detention of the state's mentally ill.

*Cairl v. State,* 323 N.W.2d at 23 n. 3. *Cf. Sukeforth v. Thegen,* 256 A.2d 162, 164–65 (Me.1969) (physician certifying patients for emergency admittance to mental hospital acts in quasi-judicial capacity and enjoys a qualified immunity).

The purpose of the discretionary function immunity is to protect from personal liability the conduct of a government employee that requires an exercise of judgment entrusted to him by statute and that is central to establishing or carrying out governmental policy, such as Maine's statutory commitment process in this case. *See Trianon Park Condominium Assoc. v. City of Hialeah,* 468 So.2d at 918; *Restatement (Second) of Torts* § 895D comment b. For this reason, rather than that relied upon by the Superior Court, we affirm the summary judgment entered in favor of Dr. Jacobsohn.

### C. *Other AMHI employees who participated in team diagnosis*

Our affirmance of the summary judgment in favor of Dr. Jacobsohn requires us as well to affirm the dismissal of the claims against the other AMHI employees who assisted Dr. Jacobsohn in making the involuntary commitment decision. Again, as the affidavits in this case make clear, none of those employees undertook to treat Darling's psychological condition but instead at the relevant time did nothing more than assist Dr. Jacobsohn in the evaluation and diagnosis required to be made by 34 M.R.S.A. § 2372. It is this diagnosis that was critical to the State's statutory commitment process, and therefore all those government employees who participated in the patient's evaluation as so required are protected by the discretionary function immunity from suit for the allegedly negligent decision that they helped Dr. Jacobsohn to reach. The Superior Court properly entered judgment in their favor.

### IV.

### *Claims against Sheriff Joyce and Deputy Sheriff Kerwin*

#### A. *State law claims*

■ Plaintiff sued Cumberland County Sheriff Joyce and Deputy Sheriff Kerwin, seeking damages for their allegedly negligent failure to protect Darling in confinement with adequate suicide prevention procedures.[8] The Superior Court properly granted summary judgment in favor of defendants Joyce and Kerwin on those state law claims because of plaintiff's failure to comply with the notice procedures of the Maine Tort Claims Act.

Section 8107 of the Tort Claims Act requires that a potential plaintiff notify a governmental entity of a possible claim within 180 days of the accrual of the action against that entity. 14 M.R.S.A. § 8107(1) (1980). Defendants Joyce and Kerwin are employees of Cumberland County, a governmental entity under the Act. *Id.* § 8102(2)–(3). At no time did plaintiff notify Cumberland County of her claim against Joyce and Kerwin. Plaintiff argues, however, that because she was not seeking to impose liability on the governmental entity itself the notice provisions of the Act do not apply to her suit against the employees personally. The Superior Court rejected this contention and so do we.

---

**8.** Plaintiff amended her complaint on July 25, 1986, to allege that Sheriff Joyce and Deputy Sheriff Kerwin acted with reckless or callous disregard or deliberate indifference in failing to take adequate steps to prevent Darling's suicide.

The provisions and structure of the Maine Tort Claims Act make clear that the legislature saw a significant state interest in regulating the circumstances in which a person could bring suit not only against a governmental entity but also against a government employee acting within the scope of his employment. The statute sets out a number of provisions governing personal suits against government employees. First, the Act grants personal immunity to employees for their legislative, judicial, or discretionary activities. 14 M.R.S.A. § 8111. In addition, the Act limits to $10,-000 the amount that a plaintiff can recover in a personal suit against a *nonimmune* government employee. *Id.* § 8103(3). The Act also requires that a governmental entity "assume the defense of and shall indemnify" any employee for his negligent acts within the scope of his employment when liability is also asserted against the entity itself under section 8104. *Id.* § 8112(2). Finally, even when the governmental entity is immune from suit for the negligent act of an employee but the employee himself could be personally liable, the Act authorizes the entity at its discretion to defend and indemnify the employee in that claim. *Id.* § 8112(1).

The Tort Claims Act, therefore, both by the limits it places on personal liability of employees and by the discretionary authority it grants an immune entity to defend and indemnify a nonimmune employee, articulates the significant state interest in regulating the conditions under which suit can be prosecuted against government employees. By giving some protection to government employees, these regulations ultimately assist the governmental entity itself in attracting and keeping employees well qualified to carry out important functions of government.

A central purpose advanced by the notice provisions of the Tort Claims Act is to avoid "needless expense and litigation by providing an opportunity for amicable resolution of disputes...." *Faucher v. City of Auburn*, 465 A.2d 1120, 1123 (Me.1983). Because of the governmental entity's right, and in some instances obligation, to defend and indemnify its employees,[9] the requirement of notice to the entity advances that purpose even though the entity is not itself joined as a defendant.

Against this background the specific language of the Tort Claims Act requiring notice of claims to the entity, even if not sued itself, becomes clear. The Act states:

> **B.** Notice of claims against any *political subdivision or an employee thereof* shall be addressed to and filed with one of the persons upon whom a summons and complaint could be served under the Maine Rules of Civil Procedure, Rule 4, in a civil action against a *political subdivision.*

*Id.* § 8107(3)(B) (emphasis added). Section 8107 also provides: "No claim or action shall be commenced against *a governmental entity or employee* ... unless the foregoing notice provisions are substantially complied with." *Id.* § 8107(4) (emphasis added). Read in its statutory context, section 8107 contains no ambiguity. It requires a claimant to notify the governmental entity of a claim against its employee for conduct within the scope of his employment even though no claim is asserted against the entity itself. Since plaintiff never gave a Tort Claims Act notice to Cumberland County, the Superior Court correctly entered summary judgment in favor of Sheriff Joyce and Deputy Sheriff Kerwin on the state law claims.[10]

---

**9.** Plaintiff correctly notes that the governmental entity is no longer bound to defend and indemnify an employee who has failed to notify it of the complaint within 30 days if the entity is thereby prejudiced. 14 M.R.S.A. § 8112(2) (1980). Nevertheless, when the employee has failed to notify the entity, the Act still grants the entity a discretionary right to defend and indemnify under section 8112(1). Requiring a claimant to notify the entity allows it to step in and exercise this statutory right if it so chooses.

**10.** The case at bar does not involve circumstances in which the plaintiff sues an individual defendant without knowing that the defendant's conduct at issue fell within the scope of his employment by a governmental entity. We thus have no occasion to consider the applicability of the "good cause" exception to the notice requirement of 14 M.R.S.A. § 8107(1).

## B. *Federal section 1983 claims*

■ Plaintiff contends that in their conduct toward Darling at the Cumberland County jail the afternoon he committed suicide, Sheriff Joyce and Deputy Sheriff Kerwin demonstrated such a "reckless or callous disregard of or [deliberate] indifference to the rights or safety of Mr. Darling" as to violate his right against "cruel and unusual punishments" and his right not to be deprived of life, liberty, or property without due process of law, rights protected respectively under the Eighth and Fourteenth Amendments of the United States Constitution. Plaintiff brought this claim under 42 U.S.C.A. § 1983 (1981), which provides in part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

Plaintiff concedes, as she must, that under section 1983 in order to establish the constitutional violations alleged, she must prove that defendants acted toward Darling with at least "recklessness or deliberate indifference." *Williams v. City of Boston*, 784 F.2d 430, 433–34 (1st Cir.1986).[11]

After examining the affidavits of all parties and the depositions of Sheriff Joyce and Deputy Sheriff Kerwin, the Superior Court ordered summary judgment in favor of defendants, concluding that "no rational basis exists to support characterizing the actions, or omissions to act, of the defendants ... as subjectively intending, or as manifesting reckless or callous indifference to, the occurrence of Darling's suicide." We agree with that statement as to Sheriff Joyce; but we do not as to Deputy Sheriff Kerwin.

A court may grant summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." M.R.Civ.P. 56(c). A court has properly granted summary judgment only "if the facts before the court conclusively preclude a party from recovery." *Jordan v. H.C. Haynes, Inc.*, 504 A.2d 618, 619 (Me.1986) (citing *Nichols v. Marsden*, 483 A.2d 341, 344 (Me. 1984)). The party seeking summary judgment has the burden of establishing the absence of any issue of material fact in his opponent's case. *See Nichols v. Marsden*, 483 A.2d at 344; 2 Field, McKusick & Wroth, *Maine Civil Practice* § 56.2a, at 36 (2d ed. 1970).

The affidavits and depositions before the motion justice, when read most favorably to plaintiff, against whom the Superior Court granted summary judgment, would support the following findings: On July 4, 1982, while in Cumberland County jail awaiting trial of his insanity defense, Darling refused to eat. Officials at the jail, concerned about Darling's mental status since he had some months earlier been placed on a one-on-one suicide watch, sent him for examination at Maine Medical Cen-

---

11. In *Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986), the United States Supreme Court made clear that "the Due Process Clause is simply not implicated by a *negligent* act of an official causing unintended loss of or injury to life, liberty or property." *Id.*, 474 U.S. at 330–32, 106 S.Ct. at 665, 88 L.Ed.2d at 668 (emphasis in original). The plaintiff must instead establish, the Court continued, some heightened level of culpability such as an "affirmative abuse of power," *id.* at 330, 106 S.Ct. at 664–65, 88 L.Ed.2d at 667, or "deliberate" misconduct, *id.* at 331, 106 S.Ct. at 665, 88 L.Ed.2d at 668. *See also Davidson v. Cannon*, 474 U.S. 344, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986). The First Circuit Court of Appeals in *Williams v. City of Boston*, 784 F.2d 430, 434 (1st Cir.1986), has read these Supreme Court decisions as requiring on a section 1983 claim a showing that the defendant acted with "reckless or deliberate indifference" to the due process rights of the plaintiff. The Supreme Court has itself stated that to establish under section 1983 an Eighth Amendment claim of cruel and unusual punishment the plaintiff must show that the defendant acted with "deliberate indifference" to the plaintiff's situation. *See Estelle v. Gamble*, 429 U.S. 97, 105, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976).

ter. Once there, Darling refused treatment and the hospital returned him to the jail. On receiving that information, Sheriff Joyce ordered that a medical officer at the jail further examine Darling, that arrangements be made for additional evaluations at Maine Medical Center, and that the guards institute a one-on-one observation of Darling in his cell. Under the jail's one-on-one observation policy, a guard maintains a continuous watch of the suicidal inmate and is not to leave him unless relieved by someone else. A certified paramedic at the jail examined Darling and "suggested that he be put in sick bay with all means of self-destruction removed." That suggestion was not relayed to Sheriff Joyce, and Deputy Sheriff Kerwin undertook the one-on-one observation.

The one-on-one observation ordered by Sheriff Joyce, if effectively carried out, would have prevented Darling's suicide. By ordering that Darling be continuously watched, Sheriff Joyce ordered a course of conduct fully adequate for dealing with Darling's situation. The depositions and affidavits therefore fail to raise an issue of material fact as to whether Sheriff Joyce acted with deliberate indifference to the risk of Darling's suicide.

Deputy Sheriff Kerwin's failure to follow fully the jail's observation procedures, however, does raise sufficiently a fact question whether he acted with deliberate indifference to Darling's needs. Kerwin knew of Darling's suicidal tendencies and knew the purpose of the jail's one-on-one observation policy. Rather than continuously watching Darling as ordered, the deputy sheriff carried out his duties in a way making it impossible for him to keep Darling always in sight. First, Kerwin chose to position his chair at the end of the corridor where his view of Darling's cell was partially obstructed, allowing a view only of Darling's legs and feet. Even when Kerwin walked back and forth in front of the cell he could not fully see inside because of the blanket he allowed Darling to hang where it could block the light from his eyes. Finally, even though Kerwin was assigned no other responsibilities other than to watch Darling, he did at one fatal point undertake to assist other guards in the strip search of another inmate. That task, lasting five to ten minutes, did not take him from the general vicinity of Darling's cell but did prevent him from maintaining a watch of Darling. It was after this strip search that Kerwin discovered Darling had hanged himself. The deputy sheriff did all he could to resuscitate Darling, but to no avail.

On the foregoing facts, established by affidavit and deposition, it was error for the Superior Court to grant summary judgment in favor of Deputy Sheriff Kerwin. It was error for the court to conclude that the established facts preclude plaintiff from recovering in her claim that Kerwin's failure in his duty to protect Darling from suicide came from recklessness or deliberate indifference to Darling's safety. The above-recited facts do not *compel* that conclusion. On the other hand, a jury or other factfinder could rationally reach that conclusion by inference from those facts. In these circumstances the materials before the motion justice left a genuine issue of material fact yet to be decided; namely, the mental state of Kerwin at the critical time of Darling's suicide. We vacate the summary judgment granted Kerwin on the section 1983 claim.

The entry is:

Vacate the order granting summary judgment in favor of Deputy Sheriff Kerwin on the 42 U.S.C.A. § 1983 claim and remand to Superior Court for further proceedings consistent with the opinion herein.

Judgments affirmed as to the state law claim against Deputy Sheriff Kerwin and as to all claims against all other parties.

All concurring.