2009 ME 88

Jane DOE

v.

Jennifer GRAHAM et al.

Supreme Judicial Court of Maine.

Argued: Nov. 19, 2008.
Decided: Aug. 13, 2009.

Mark C. Joyce, Esq. (orally), Disability Rights Center of Maine, Augusta, ME, for Jane Doe.

Christopher C. Taintor, Esq. (orally), Norman, Hanson & DeTroy, Portland, ME, for Jennifer Graham, Maine Medical Center and Security Guards.

Panel: SAUFLEY, C.J., and CLIFFORD, ALEXANDER, LEVY, SILVER, MEAD, and GORMAN, JJ.

SAUFLEY, C.J.

[¶ 1]  Jane Doe was the subject of an evaluation and assessment for possible emergency involuntary commitment for mental health treatment.  After staff at Maine Medical Center certified Doe for emergency commitment, she was delivered to Spring Harbor Hospital for treatment. She was released from Spring Harbor within several hours of her arrival.  Doe eventually sued Jennifer Graham, M.D., Maine Medical Center, and two unnamed security guards, based on their allegedly wrongful acts and omissions in holding, assessing, and certifying her for involuntary commitment.  On motion of MMC and its staff, the Superior Court (Cumber-

land County, *Delahanty, J.*) dismissed Doe's complaint. She appeals from the judgment of dismissal, and we affirm the judgment.

## I. BACKGROUND

[¶ 2] Because the matter was resolved on a motion to dismiss pursuant to M.R. Civ. P. 12(b)(6), "[w]e examine the complaint in the light most favorable to the plaintiff to determine whether it sets forth elements of a cause of action or alleges facts that would entitle the plaintiff to relief pursuant to some legal theory." *Saunders v. Tisher*, 2006 ME 94, ¶ 8, 902 A.2d 830, 832 (quotation marks omitted). We will affirm the dismissal "when it appears beyond a doubt that the plaintiff is not entitled to relief under any set of facts that he might prove in support of his claim." *Id.* (quotation marks omitted).

[¶ 3] Thus, we view the following facts alleged in Doe's complaint as if they were admitted. On August 15, 2004, Doe confronted her husband about having an extramarital affair. In response, Doe's husband claimed that Doe was suicidal and called the police. The police arrived and took Doe against her will to the emergency department at MMC in Portland. There, Graham evaluated Doe for an emergency involuntary commitment to a psychiatric hospital. At the time of this evaluation, Graham was a medical resident practicing under an educational certificate and not a fully-licensed physician.

[¶ 4] Doe repeatedly informed Graham that she was not suicidal and that she wanted to leave. Graham responded that she could "make things difficult" for Doe, or she could make the process easy if Doe

agreed to cooperate. Doe continued to ask to be released, and at one point two hospital security guards untied the restraints on a nearby table and told Doe that they would strap her to the table and put a diaper on her if she did not give them her wallet. One of the security guards also held Doe's keys in the air and told her that she was "stupid" if she thought they would be returned. Graham told Doe that she had "no control over what the guards do," which Doe interpreted to be a threat of physical force.

[¶ 5] Graham refused Doe's request for immediate release. Graham included in her assessment of Doe's psychiatric status information obtained during telephone conversations with a number of individuals, including the woman with whom Doe believed her husband was having an affair. Doe alleges that Graham released confidential information to this woman without Doe's authorization and disregarded Doe's assertions regarding an advance directive prohibiting Doe's husband from making any healthcare decisions for her. Graham certified Doe for emergency involuntary commitment pursuant to 34–B M.R.S. § 3863 (2005).[1] Doe was then transported to Spring Harbor Hospital and was discharged within two hours when providers there completed an evaluation and determined that she did not require hospitalization.

[¶ 6] On July 19, 2007, Doe filed an eighteen-count notice of claim against Graham, MMC, and the two security guards pursuant to the Maine Health Security Act, *see* 24 M.R.S. §§ 2853(1)(B), 2903(1)(A) (2008), and amended the claim on August 9, 2007.[2] The eighteen counts included three federal counts, one count

---

1. Title 34–B § 3863 has since been amended. P.L. 2007, ch. 319, § 9 (effective Sept. 20, 2007) (codified at 34–B M.R.S. § 3863 (2008)).

2. Although the original notice of claim was not filed anonymously, Doe successfully moved to proceed under a pseudonym during the pendency of this appeal.

seeking declaratory relief, and fourteen state law damages counts. Graham, MMC, and the security guards moved to dismiss the fourteen state law counts, comprising thirteen common law tort claims and one civil rights claim,[3] arguing in part that they are entitled to discretionary function immunity pursuant to the Maine Tort Claims Act and because they are "deemed to be a governmental entity or an employee of a governmental entity under the Maine Tort Claims Act" pursuant to 34–B M.R.S. § 3861(1)(A) (2008).

[¶ 7] The Superior Court granted the motion to dismiss. With regard to the thirteen common law tort claims, the court concluded that, pursuant to the Maine Tort Claims Act, Graham, MMC, and the guards are immune from any liability associated with the involuntary commitment process. The court also dismissed Doe's civil rights claim, determining that because the involuntary commitment statute provided adequate procedural protections, her due process rights had not been violated. Doe timely filed this appeal from the Superior Court's dismissal and subsequently amended her notice of claim by removing the four counts not subject to the motion to dismiss, thus finally resolving each count before the court.

## II. DISCUSSION

### A. Common Law Tort Claims

[¶ 8] The Maine Tort Claims Act, 14 M.R.S. §§ 8101–8118 (2008), provides broadly that "[e]xcept as otherwise expressly provided by statute, all governmental entities shall be immune from suit on any and all tort claims seeking recovery of damages," *id.* § 8103(1). The Tort Claims Act also extends personal immunity to employees of governmental entities in certain circumstances, including for "[p]erforming or failing to perform any discretionary function or duty, whether or not the discretion is abused; and whether or not any statute, charter, ordinance, order, resolution, rule or resolve under which the discretionary function or duty is performed is valid." *Id.* § 8111(1)(C).

[¶ 9] The Superior Court premised its determination that Graham, MMC, and the security guards are immune from suit pursuant to the Tort Claims Act on two grounds: (1) the statutory grant of governmental status conferred to nonstate mental health institutions and their employees when they admit, treat, or discharge involuntarily committed patients, *see* 34–B M.R.S. § 3861(1)(A); and (2) our precedent establishing that discretionary function immunity extends to physicians and support staff participating in involuntary commitment evaluations at both state and private hospitals, *see Clark v. Me. Med. Ctr.*, 559 A.2d 358 (Me.1989); *Taylor v. Herst*, 537 A.2d 1163 (Me.1988); *Darling v. Augusta Mental Health Inst.*, 535 A.2d 421 (Me.1987). We address each basis for immunity in turn.

### 1. Immunity for Treatment of Involuntarily Committed Patients Pursuant to Section 3861(1)(A)

[¶ 10] In 1990, the Legislature amended the statute governing the reception of involuntarily committed persons, and artic-

**3.** Specifically, the fourteen state law damages counts included two counts of medical malpractice negligence; two counts of vicarious liability; and one count each of intentional infliction of emotional distress, negligent infliction of emotional distress, false light invasion of privacy, wrongful disclosure of confidential information, negligent or reckless training, negligent or reckless supervision, negligent or reckless permitting or failure to prevent tortious conduct, corporate negligence, a request for punitive damages, and a violation of the Maine Civil Rights Act.

ulated that Tort Claims Act immunity extends to nonstate facilities that accept such individuals for treatment. *See* P.L. 1989, ch. 906 (effective July 14, 1990). The pertinent portion of the statute, as amended, provides:

**1. Nonstate mental health institution.** The chief administrative officer of a nonstate mental health institution may receive for observation, diagnosis, care and treatment in the institution any person whose admission is applied for under any of the procedures in this subchapter. . . .

A. The institution, any person contracting with the institution and any of its employees when *admitting, treating or discharging* a patient under the provisions of sections 3863 and 3864 under a contract with the [Department of Health and Human Services], for purposes of civil liability, must be deemed to be a governmental entity or an employee of a governmental entity under the Maine Tort Claims Act. . . .

34–B M.R.S. § 3861(1)(A) (emphasis added).

[¶ 11] The statute's express grant of governmental status to facilities "under a contract" with the Department of Health and Human Services is intended to encourage nonstate hospitals to accept committed patients by encompassing those facilities within the provisions of Tort Claims Act immunity. *Lever v. Acadia Hosp. Corp.*, 2004 ME 35, ¶¶ 17–18, 845 A.2d 1178, 1182.

[¶ 12] The focus of section 3861(1)(A) is the admission, treatment, and potential discharge of patients who have already been involuntarily committed. It does not address those instances, governed by section 3863, in which public or private facilities and their staff undertake the evaluations and assessments that are necessary to determine if involuntary commit-

ment is appropriate in the first instance. Thus, it addresses a different part of the continuum of evaluation and care than that at issue here. Graham and the MMC staff accepted Doe for evaluation and assessment regarding a potential involuntary commitment and were not "admitting, treating or discharging" an involuntarily committed patient. 34–B M.R.S. § 3861(1)(A). Therefore, section 3861(1)(A) was not applicable to their conduct, and the Superior Court's reliance on that provision, on these facts, was misplaced.

[¶ 13] The enactment of section 3861(1)(A) did not, however, alter or eliminate the discretionary act immunity already provided to those physicians and support staff participating in the initial evaluative services prior to involuntary commitment and treatment. *Lever*, 2004 ME 35, ¶¶ 19–20, 845 A.2d at 1182. Thus, we next consider if this immunity extends to Graham, MMC, and the security guards in this instance.

2. Immunity for Evaluation and Certification Prior to Involuntary Commitment

[¶ 14] Both state-employed physicians who are involved in the evaluative process antecedent to an involuntary commitment and the employees who assist in that process perform discretionary functions subject to the immunity provided for by the Tort Claims Act. *Darling*, 535 A.2d at 427–29. Discretionary function immunity also extends to *non-state* physicians performing involuntary commitment evaluations because those physicians act "in an official capacity on behalf of the State." *Taylor*, 537 A.2d at 1165; *Clark*, 559 A.2d at 360.

[¶ 15] Doe asks us to apply the discretionary immunity provisions of the Act

only to the ultimate commitment decision made by medical professionals exercising professional judgment. Urging this very narrow interpretation, Doe argues that her claims involving the conduct of Graham and the security guards leading up to the ultimate determination to commit her would not be subject to discretionary function immunity.

[¶ 16] Nothing in our precedent supports Doe's narrow reading. In *Taylor*, we determined that private physicians performing involuntary commitment evaluations are governmental employees for the purposes of the Act because the role of these physicians is "central to effecting the State's important responsibilities of protecting the public and treating the mentally ill." 537 A.2d at 1165 (quoting *Darling*, 535 A.2d at 428). We emphasized that, "[w]ithout protection from civil liability, physicians would be discouraged from *examining* persons for involuntary commitment, thereby making the process unworkable." *Id.* at 1166 (emphasis added). Indeed, our previous holdings applying discretionary function immunity to the involuntary commitment evaluation process have consistently recognized the clear legislative intent to increase incentives for hospitals and their employees to participate in that process. *See Lever*, 2004 ME 35, ¶¶ 19–20, 845 A.2d at 1182; *Taylor*, 537 A.2d at 1165–66; *Darling*, 535 A.2d at 428–29.

[¶ 17] Limiting the application of the Act to the ultimate commitment determination, as Doe suggests, would expose physicians and their staff, along with the state facilities and private hospitals that employ

them, to liability for any conduct occurring during the examination process and would thwart the very policies that the Legislature has deemed vital. Acts taken by a medical professional and supporting staff during the course of an evaluation leading up to the ultimate commitment determination are an integral part of the involuntary commitment process. Similarly, the involvement of hospital security guards is necessary to ensure that involuntary commitment examinations can be safely performed under circumstances that may involve unwilling and uncooperative patients who pose a potential threat to themselves or others. *See Darling*, 535 A.2d at 429 (holding that state employees who assist physicians in conducting the involuntary commitment evaluation are protected by discretionary function immunity). Accordingly, private physicians conducting involuntary commitment evaluations, as well as those employees who assist in that process, act in the capacity of governmental employees for the purposes of the immunity provisions of the Tort Claims Act.[4]

■■■ [¶ 18] Doe next argues that, even if any such immunity extended to the involuntary commitment evaluation process, certain conduct of Graham and the security guards during the course of her evaluation should be excluded from the purview of the Tort Claims Act. Specifically, Doe alleges that, during the course of her evaluation, Graham had inappropriate telephone conversations with third parties resulting in the disclosure of confidential information, and that the security staff

---

4. Doe's arguments regarding MMC's immunity is premised on the same narrow interpretation of *Darling, Taylor,* and *Clark* that we now reject. We have previously indicated that the protections of the Tort Claims Act extend not only to those persons participating in the evaluative process, but also to those private

hospitals that employ them, *see Lever v. Acadia Hosp. Corp.*, 2004 ME 35, ¶¶ 19–20, 845 A.2d 1178, 1182, and, based on the record before us and the arguments of counsel, we conclude that MMC is immunized from Doe's claims.

made rude, embarrassing, or threatening statements to her.

[¶ 19] Not all actions taken by physicians or hospital employees during the course of an involuntary commitment evaluation are automatically immunized from suit. We have indicated that discretionary function immunity does not extend to actions "that so *clearly exceed* the scope of the official's authority that the official cannot be said to be acting in an official capacity." *Selby v. Cumberland County*, 2002 ME 80, ¶ 6 n. 5, 796 A.2d 678, 680. In this circumstance, the scope of discretionary function immunity is limited to those acts that are "central to effecting the State's important responsibilities of protecting the public and treating the mentally ill." *Taylor*, 537 A.2d at 1165 (quoting *Darling*, 535 A.2d at 428); *see also Jorgensen v. Dep't of Transp.*, 2009 ME 42, ¶ 15, 969 A.2d 912, 917 (noting that discretionary function immunity applies to "discretionary decisions that were integral to the accomplishment of a uniquely governmental policy or program" (quotation marks omitted)). Actions and decisions made in furtherance of governmental policy are discretionary and immune from suit, even in instances where the discretion is abused. *See* 14 M.R.S. § 8111(1)(C).

[¶ 20] Here, the conduct alleged by Doe in her notice of claim does not fall outside of the purview of discretionary function immunity under the Act. Graham's decision to obtain additional information from third parties regarding Doe's condition, as well as the security guard's allegedly unprofessional behavior, each represent discretionary acts taken in furtherance of reaching the statutorily-mandated diagnosis necessary to determine if involuntary commitment was warranted in Doe's instances.[5] *See Brooks v. Augusta Mental Health Inst.*, 606 A.2d 789, 791 (Me.1992) (holding that the supervision of patients by state mental health employees involves the exercise of professional judgment falling within the discretionary function immunity of the Act). These acts do not so far exceed the bounds of authority so as to remove Graham and the security guards from the protections of discretionary function immunity.[6]

## B. Maine Civil Rights Act Claim

[¶ 21] The Maine Civil Rights Act provides a private right of action against

---

5. We note that Doe did not specifically allege that Graham disclosed confidential medical information in violation of either the relevant provisions of the Federal Health Insurance Portability and Accountability Act, *see* 42 U.S.C.S. §§ 1320d–1320d(9) (2008 & Supp. 2009), or state law, *see* 22 M.R.S. § 1711–C (2008) (providing for the confidentiality of health care information). We have no occasion to decide whether such claims would be cognizable in this instance. We merely hold that, with regard to Doe's claims, Graham is personally immune from any tort liability arising from the alleged disclosures.

6. Doe also argues that because Graham was a resident and not yet a fully-licensed physician at the time the evaluation at issue was conducted, she was not authorized to examine Doe for emergency commitment and thus was not subject to the protections of the Tort Claims Act. Although the involuntary commitment statute does not expressly authorize residents to conduct a certifying examination, *see* 34–B M.R.S. § 3863(2)(A) (2008), the statutory scheme governing medical licensure provides that residents practicing under an educational certificate are "entitled to all the rights granted to physicians who are licensed to practice medicine and surgery," as long as their practice "is limited to the training programs in which they are enrolled." 32 M.R.S. § 3279(3) (2008). Construing this statute in conjunction with section 3863(2), Graham was clearly authorized as a resident to conduct an evaluation of Doe and is therefore subject to the same protections as a licensed physician performing the same function.

any person, whether or not acting under color of law, [who] intentionally interferes or attempts to intentionally interfere by physical force or violence against a person ... or by the threat of physical force or violence against a person ... with the exercise or enjoyment by any other person of rights secured by the United States Constitution or the laws of the United States or of rights secured by the Constitution of Maine or laws of the State....

5 M.R.S. § 4682(1–A) (2008). Doe's Civil Rights Act claim alleges that, during the course of her evaluation, both Graham and the security guards deprived her of her liberty in violation of the United States and Maine Constitutions.

[¶ 22] Under both federal and state constitutional standards, the deprivation of liberty is prohibited when it occurs "without due process of law."[7] *See Northup v. Poling*, 2000 ME 199, ¶ 9 & n. 5, 761 A.2d 872, 875; U.S. Const. amend. XIV, § 1; Me. Const. art. I, § 6–A. As the Superior Court concluded, a careful reading of Doe's notice of claim reveals that she has not sufficiently alleged a lack of due process in this instance.

[¶ 23] To determine whether a specific procedure comports with due process, we look to three factors: (1) the private interest at stake; (2) the risk of error inherent in the procedure; and (3) the government interest in the procedure. *Mathews v. Eldridge*, 424 U.S. 319, 335, 96

S.Ct. 893, 47 L.Ed.2d 18 (1976); *In re Kevin C.*, 2004 ME 76, ¶ 10, 850 A.2d 341, 344; *Green v. Comm'r of Mental Health & Mental Retardation*, 2000 ME 92, ¶ 18, 750 A.2d 1265, 1271–72. We have previously recognized that both the private and governmental interests associated with involuntary commitment due to mental illness are "substantial." *In re Kevin C.*, 2004 ME 76, ¶ 11, 850 A.2d at 344. Accordingly, in order to satisfy constitutional standards, the involuntary commitment procedure must also be substantial in order to ensure that the risk of error in commitment determinations is low. *Id.* ¶ 12, 850 A.2d at 344.

[¶ 24] Maine's involuntary commitment scheme contains numerous procedural safeguards to protect against erroneous commitment decisions. Before an individual can be committed against her or his will, a medical professional must examine the individual and certify that the person is mentally ill and poses a "likelihood of serious harm." 34–B M.R.S. § 3863(2). If this initial diagnosis is made, a court is required to review the application and certificate within twenty-four hours, *id.* § 3863(3), and then, if the person is admitted to a psychiatric hospital, a staff physician other than the original certifying examiner must examine the person within twenty-four hours to again determine if the person requires emergency commitment, *id.* § 3863(7). Finally, any person committed under section 3863 is entitled to

---

**7.** We have also previously identified state action as a prerequisite to maintaining a due process challenge. *See Northup v. Poling*, 2000 ME 199, ¶ 9 & n. 5, 761 A.2d 872, 875. In addition, in *Phelps v. President & Trustees of Colby College*, 595 A.2d 403, 405–08 (Me. 1991), we held that, although the Maine Civil Rights Act expressly provided for a remedy against interference of rights by private parties, the Act was intended to address existing rights and did not expand or create substantive rights. Nevertheless, Doe asserts that the language of the Civil Rights Act authorizes a claim for deprivation of liberty without state action. Because we conclude that Doe's civil rights claim is facially insufficient to present a viable due process challenge, we need not address the state action requirement or whether Graham and the security guards were state actors for the purposes of the Civil Rights Act.

a hearing in District Court and appellate review in the Superior Court. 34–B M.R.S. § 3864(5), (11) (2008).

[¶ 25] In her notice of claim, Doe broadly alleges that the security guards' threats of force and Graham's actions taken in connection with the involuntary commitment process operated to deprive her of her liberty. However, she does not raise any specific infirmity with the commitment procedure itself or claim that there was a deviation from the statutory requirements contained in section 3863. Indeed, that very procedure protected Doe from erroneous deprivation in this instance, as she was released by Spring Harbor within hours of her transfer there from MMC.

[¶ 26] We recognize that restraint of an individual for any length of time is a significant matter, and we do not minimize the distress that the restriction on a person's liberty for even a brief number of hours can cause. However, Doe has not sufficiently alleged a failure of due process necessary to sustain a claim of *deprivation* of liberty under federal and state constitutional standards, and dismissal of her Civil Rights Act claim is warranted.[8]

The entry is:

Judgment affirmed.

---

8. Graham, MMC, and the security guards also argue that each of Doe's state law damages claims, including her civil rights claim, are barred by the two-year statute of limitations contained in the Tort Claims Act, *see* 14 M.R.S. § 8110 (2008), citing our decision in *Hinkley v. Penobscot Valley Hospital*, 2002 ME 70, 794 A.2d 643. Because we conclude that Doe's notice of claim fails to state a claim upon which relief can be granted, *see* M.R. Civ. P. 12(b)(6), we do not address this issue.