STATE of Maine

v.

Patricia A. HOPKINS.

Supreme Judicial Court of Maine.

Argued March 10, 1987.
Decided May 28, 1987.

James E. Tierney, Atty. Gen., Rae Ann French (orally), Asst. Atty. Gen., Augusta, for plaintiff.

James C. Hunt (orally), Daniel G. Lilley, P.A. Law Offices, Portland, for defendant.

Before McKUSICK, C.J., and NICHOLS, ROBERTS, WATHEN, SCOLNIK and CLIFFORD, JJ.

ROBERTS, Justice.

Patricia A. Hopkins appeals from judgments of conviction entered by the Superior Court, Cumberland County, upon a jury verdict of guilty of two counts of theft by deception, 17–A M.R.S.A. § 354 (1983), and two counts of unsworn falsification, 17–A M.R.S.A. § 453(1)(B)(1) (1983). These charges involve illegal receipt of "welfare benefits"—Aid to Families With Dependent Children (AFDC) and food stamps—from the Maine Department of Human Services (DHS). Hopkins was tried on a theory of accomplice liability—that Hopkins was an accomplice to Clinton Jackson in committing the crimes noted above. We recently affirmed Jackson's convictions. *See State v. Jackson*, 525 A.2d 215 (1987). Hopkins contends on appeal that the presiding justice committed several evidentiary errors,

that he failed to instruct the jury properly, that the evidence was insufficient to support the verdict, and that an illegal sentence was imposed. We reject these contentions and affirm the judgments.

## I.

The key issue at trial was whether Patricia Hopkins deceived DHS into believing that she did not live with Clinton Jackson, the father of her son, C.J. If she did live with Jackson and C.J., Jackson would not have been eligible to receive the benefits in question. The State's theory of the case was that Hopkins assisted Jackson in misleading and deceiving DHS into believing that she *was not* in fact living with him. She did this by helping Jackson fill out the application forms that led to his receiving benefits and by submitting two letters containing false information to the DHS in an effort to secure benefits for Jackson. These submitted letters form the basis for the unsworn falsification charges.

Between January 1982 and November 1983, Hopkins lived with Jackson in several different apartments in Portland. In February 1982 Jackson applied to DHS for AFDC benefits, falsely telling the DHS worker taking his application that he and Hopkins were separated and that he had custody of C.J. Hopkins assisted Jackson in filling out this application. Benefits were subsequently paid to Jackson as a result of the initial application. In July 1982 Jackson applied to DHS for food stamps, supplying essentially the same information. Hopkins assisted Jackson with that application as well, and Jackson began receiving food stamps. On twelve other occasions Jackson, with Hopkins' assistance, continued to assert to the DHS that he and Hopkins were separated and not living together. During this time Jackson transmitted to the DHS the false statements prepared by Hopkins indicating that she did not live with Jackson. As a result of these false statements, Jackson received $3502 in AFDC benefits and $1796 in food stamps. The DHS workers testified at trial that but for Jackson's statements that Hopkins was not living with him they would not have approved his applications for benefits.

## II.

Hopkins raises several issues with respect to the court's admission and exclusion of evidence. Only some of these issues have been preserved for appellate review. Several are controlled by our decision in *State v. Jackson.*

■ Hopkins first contends that it was obvious error for the court to permit oral testimony by DHS caseworkers and supervisors concerning their application of AFDC and food stamp policies, regulations, and statutes to Jackson's case. These workers testified that but for Jackson's statements that Hopkins did not live with him and C.J. they would not have approved his applications for benefits. They also explained why, based on their knowledge of the relevant statutes and regulations, they would have denied him benefits if they had known of his true living situation. For reasons stated in *Jackson*, 525 A.2d at 218, we conclude that the presiding justice committed no error in permitting the DHS workers to explain their understanding of the applicable regulations and statutes.

■ Hopkins also argues, as did Jackson, that the presiding justice committed reversible error when he permitted testimony by a DHS worker concerning a 1980 food stamp fair hearing at which Jackson and Hopkins were in attendance. Hopkins argues that testimony by DHS workers about events transpiring at this hearing was inadmissible hearsay. For reasons set forth in *Jackson*, 525 A.2d at 218, we conclude that this testimony was not admitted for the truth of the matters asserted and hence was not hearsay.

Hopkins next contends that it was reversible error for the presiding justice to exclude the testimony of a defense witness designed to rehabilitate that witness before she was impeached by the State on cross-examination.

Clare Hopkins, the defendant's mother, testified for the defense that Patricia had stayed overnight at her parents' Cape Eliz-

abeth home, received mail there, and left there some personal possessions. Clare Hopkins' testimony was important because Patricia Hopkins and Jackson had consistently maintained to the DHS that Patricia was living with her parents in Cape Elizabeth during the relevant time periods. Clare Hopkins had testified previously at a grand jury proceeding. Defense counsel at trial was aware that Clare Hopkins' testimony at trial would differ from what she had testified to previously before the grand jury. In an effort to deflect a certain attempt at impeachment by the State, defense counsel sought to elicit from Clare Hopkins her testimony before the grand jury. Thus, defense counsel on direct elicited from Clare Hopkins that she did not presently recall how many nights Patricia Hopkins stayed overnight in Cape Elizabeth. At the grand jury proceeding, however, she testified that she was "pressured" by the State's attorney and testified there that Patricia had stayed overnight only five times. The court ruled that defense counsel's line of inquiry was not within the scope of M.R.Evid. 607 because he was not attacking Clare Hopkins' credibility.

Rule 607 provides: "The credibility of a witness may be attacked by any party, including the party calling him." We agree with the presiding justice that rule 607 does not provide that counsel may rehabilitate a witness before that witness's credibility has been attacked. *See* Field & Murray, *Maine Evidence* Rule 607 Adviser's Note, at 136 (1976) (contradictory statements may be used only for *impeachment* and not as affirmative evidence). Defense counsel did not attempt to impeach or attack Clare Hopkins' credibility as provided for by the rule. Rather, anticipating an attack on her credibility, he sought to "soften the blow" by drawing out arguably inconsistent prior testimony given by the witness at a grand jury proceeding. In these circumstances, the presiding justice acted within his discretion to control the mode and order of presenting evidence under M.R.Evid. 611.

III.

Hopkins argues additionally that it was obvious error for the presiding justice to fail to instruct the jury with respect to the law governing AFDC and food stamp programs, particularly focusing on eligibility requirements for those programs. Defense counsel at trial did not object to the jury instructions relative to eligibility for food stamps or AFDC nor did he submit any proposed instructions. For reasons stated in *Jackson,* 525 A.2d at 217, the court did not err in failing to define for the jury the various technical terms contained in the relevant statutes and regulations.

Hopkins also argues that the evidence was insufficient to establish that Jackson was not legally entitled to benefits and therefore insufficient to establish that Hopkins was an accomplice. Hopkins contends that the evidence was insufficient primarily because of the alleged lack of definite standards governing eligibility for the two programs. Absent definite eligibility standards, argues Hopkins, Jackson cannot be found to have committed the crimes charged.

We reject this argument. The DHS workers testified extensively about how they routinely applied the various eligibility criteria. The defendant does not raise any issue as to the legal correctness of the DHS's workers' denial of benefits to Jackson if Hopkins was in fact living with Jackson. The evidence, viewed in a light most favorable to the prosecution, is therefore sufficient to support the jury's verdict. *See State v. Barry,* 495 A.2d 825, 826 (Me. 1985).

IV.

The sentencing justice imposed on Hopkins as a condition of a two-year term of probation an order to pay restitution to the State of Maine in the amount of $20 per week. The probation order requires Hopkins to make the $20 per week payment for the duration of the two-year term. Thus, the total amount Hopkins will return to the State over the two-year period is $2080. The defendant contends that the restitution order is illegal because the State of Maine

is not authorized by statute to receive restitution payments. While we agree with the defendant that the restitution statute, 17–A M.R.S.A. § 1321–1330 (1983 & Supp.1986) (chapter 54), does not expressly include the State of Maine as a recipient of restitution, we nevertheless conclude that the order was proper.[1]

■ We note preliminarily that because the alleged sentencing infirmity attacked here appears on the face of the record and its resolution requires us to interpret a statute, it is cognizable on appeal of the judgment of conviction. *See, e.g., State v. Beaudoin*, 503 A.2d 1289, 1290 (Me.1986).

The defendant argues that section 1324 does not authorize the State of Maine to be a restitution claimant. Section 1324(1) provides that restitution may be authorized for a victim or a dependent of a deceased victim. Section 1322 defines a "victim" as "a person who suffers personal injury, death or economic loss as a result of a crime or the good faith effort of any person to prevent a crime." The defendant acknowledges that the State of Maine has arguably suffered economic loss in the present case. She contends, however, that the State of Maine is not within the definition of "person" set forth in 17–A M.R.S.A. § 2(20) (1983): " 'person' means a human being or an organization." "Organization" is defined in section 2(19) as "a corporation, partnership or unincorporated association." The Code gives the term "government" a separate statutory definition. *See* section 2(13). Thus, the defendant is correct in asserting that the restitution statute does not expressly authorize the State of Maine to receive restitution payments.

Title 17–A M.R.S.A. § 1152(2–A) (Supp. 1986) provides that:

> Every natural person convicted of a crime may be required to make restitution as authorized by chapter 54. Subject to the limitations of chapter 54, restitution may be imposed as a condition of probation or may be imposed in addition to any other sentencing alternative included within subsection 2 with the exception of the alternative in paragraph A.

We have in previous cases analyzed this section to restrict a court's power to impose restitution unless positively authorized by the express terms of chapter 54. *See State v. Beaudoin*, 503 A.2d 1289, 1290 (Me.1986); *State v. O'Donnell*, 495 A.2d 798, 800–802 (Me.1985). In *O'Donnell* we held that a defendant could not be ordered to make restitution to a "victim" not named in an indictment charging the defendant with crimes for which he was ultimately convicted. In *Beaudoin* we concluded that, in accord with section 1322(7), "[a] restitution order may encompass only economic loss *caused to a victim by the crime* for which a defendant is convicted." *Beaudoin*, 503 A.2d at 1290 (emphasis in original). In that case, the court ordered the defendant to pay restitution for damages caused to the victim's automobile even though the defendant was charged only with leaving the scene pursuant to 29 M.R.S.A. § 894 (1978). Because the crime of leaving the scene did not *cause* the damage to the victim's automobile we concluded that the restitution order was illegal. Thus, in both *O'Donnell* and *Beaudoin*, the relevant statutory provisions clearly prohibited the orders approved by the sentencing justices in those cases.

In our most recent restitution case, *State v. LaCasce*, 512 A.2d 312, 314–316 (Me. 1986), we held that because chapter 54 did not *prohibit* the imposition of joint and several liability on two criminal defendants to pay restitution in a theft by deception case, the sentencing justice did not lack the power to fashion such an order. We also recognized in that case that joint and several liability was not specifically provided for in chapter 54. The power of the sentencing court to impose such an order derived from the court's statutory responsibility to specify a time and method of payment. *See* section 1326. Thus, the authority to impose joint and several liability was implied from the statute.

---

1. Section 1322(7) was recently amended to include as a victim a government that suffers economic loss. *See* P.L.1987, ch. 157, § 3 (effective May 22, 1987). We do not, however, rely on this amendment to conclude that the court's order was permissible.

We imply from the statute a similar judicial power to order that restitution be paid to the State of Maine. Unlike the orders in *O'Donnell* and *Beaudoin,* the sentencing justice's actions in this case were not prohibited by statute. Payment to the State is not specifically precluded by chapter 54 nor would requiring such payment violate on its face any statutory provision. We therefore conclude that the term "person" in section 2(20) does not exclude from its definition the State of Maine.

We recognize that chapter 54 is a comprehensive codification of restitution, *see O'Donnell,* 495 A.2d at 801 n. 3, and that a court lacks the inherent power to impose sentences absent legislative authorization. *See, e.g., State v. King,* 330 A.2d 124 (Me.1974) (judiciary has no inherent power to alter mandatory sentencing statute; to grant probation or suspend imposition of sentence derives fundamentally from statute). We have the power and duty, however, to interpret statutes so as to avoid absurd results. "The Legislature is presumed not to intend an absurd result, and legislation will be construed to avoid, if possible, inconsistency, contradiction and illogicality." *State v. Rand,* 430 A.2d 808, 817 (Me.1981). In our view, the Legislature in enacting chapter 54 imposed upon the trial courts the peculiarly judicial responsibility of implementing the restitution statute to avoid illogical and absurd results. To preclude the courts from requiring restitution payments to be made to the State of Maine would be both illogical and absurd. We conclude, therefore, that the sentencing justice properly required the defendant to pay restitution to the State of Maine as a condition of her probation.

Other issues raised by the defendant for the first time on appeal do not merit discussion.

The entry is:

Judgment affirmed.