Jeffrey A. PHELPS, et al.

v.

**PRESIDENT AND TRUSTEES OF COLBY COLLEGE, et al.**

Supreme Judicial Court of Maine.

Argued May 1, 1991.

Decided July 9, 1991.

Richard L. O'Meara (orally), Murray, Plumb & Murray, Portland, for appellants.

Toby H. Hollander, Claudia Sharon, Portland, for amicus curiae, Nat. Lawyers Guild.

Hugh G.E. MacMahon (orally), Barbara L. Krause, Eric R. Herlan, Drummond, Woodsum, Plimpton & MacMahon, Portland, for defendants.

Thomas Warren, Deputy Atty. Gen., Augusta, for amicus curiae State of Maine.

Before ROBERTS, WATHEN, GLASSMAN, CLIFFORD and COLLINS, JJ.

WATHEN, Justice.

Plaintiffs, nineteen students at Colby College who were members or pledges of an unauthorized fraternity, appeal from a judgment of the Superior Court (Androscoggin County, *Alexander, J.*). The court denied their request under the Maine Civil Rights Act for legal and equitable relief against defendants, the president and trustees of Colby College, for discipline imposed as a consequence of violating Colby's ban on fraternity membership and activity. The court held that the Act provides a means of enforcing existing rights against private parties, but does not expand substantive rights. Noting that the first amendment secures only the right to be free from governmental interference, the court held that the Act provides no remedy against private parties for interfering with the exercise or enjoyment of the rights of free expression or association. We conclude that the court correctly defined the scope of the Act and we affirm the judgment.

The relevant facts may be summarized as follows: Colby is a private co-educational, liberal arts college in Waterville. In 1984, after conducting a review of residential life on campus, Colby withdrew its recognition of fraternities and sororities and prohibited the practices of rushing, pledging and initiating. Each year thereafter, the Colby Student Handbook warned that participation in such activities might

result in discipline including suspension or expulsion.

Lambda Chi Alpha ("LCA") was a recognized fraternity prior to 1984 and a group by that name continued to exist thereafter in order "to associate, socialize and continue some of the fraternal traditions of the original Lambda Chi Alpha fraternity." During the next five years, Colby dealt successfully with other unauthorized secret fraternities but was unable to secure the voluntary termination of LCA. In the spring of 1990, the unauthorized fraternity activities culminated in a "hell week" that included a vigil and initiation ceremony held off-campus at the Cambridge Grange Hall. On March 21, 1990 the dean of the college received information about the activities at the Cambridge Grange and asked the director of security to investigate. As a result, a rather complete account of the activities of the fraternity, both on-campus and off-campus, came to light. After deliberation and consultation with the college community, the president and the dean of the college imposed discipline on the fraternity members and participants ranging from disciplinary probation to suspension for one semester.

Plaintiffs filed a complaint in the Superior Court requesting injunctive relief from the sanctions imposed by Colby and an award of damages under the Maine Civil Rights Act, 5 M.R.S.A. §§ 4681–83 (Supp. 1990), for Colby's alleged intentional use of threats, intimidation, or coercion in an attempt to interfere with plaintiffs' exercise of their rights of free expression and association guaranteed by the first and fourteenth amendments of the United States Constitution and article I of the Maine constitution [1]. Following an expedited eviden-

tiary hearing, the court denied plaintiffs' request for relief. Plaintiffs appeal.

I

■ This is our first occasion to address the scope and parameters of the Civil Rights Act enacted in Maine in 1989. The Act was designed to prevent intentional interference with the exercise of rights secured by the laws and constitutions of either the United States or Maine by threats, intimidation, or coercion. To that end, it authorizes civil actions both by the attorney general and by private parties:

§ 4681 Violations of constitutional rights; civil action by Attorney General

Whenever any person, whether or not acting under color of law, intentionally interferes by threat, intimidation or coercion or attempts to intentionally interfere by threat, intimidation or coercion, with the exercise or enjoyment by any other person of rights secured by the United States Constitution or the laws of the United States or of rights secured by the Constitution of Maine or laws of the State, the Attorney General may bring a civil action for injunctive or other appropriate equitable relief in order to protect the peaceable exercise or enjoyment of the rights secured. The civil action shall be brought in the name of the State and shall be instituted in the Superior Court for the county where the alleged violator resides or has a principal place of business.

§ 4682 Violations of constitutional right; civil actions by aggrieved persons

1. Remedy. Any person whose exercise or enjoyment of rights secured by the United States Constitution or the laws of the United States or of rights secured by

---

1. The first amendment provides: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." The U.S. Supreme Court has included the right of free association as among the rights protected by the first amendment. *Healy v. James,* 408 U.S. 169, 181, 92 S.Ct. 2338, 2346, 33 L.Ed.2d 266 (1972).

Article I § 4 of the Maine constitution is worded differently than the federal first amendment: "Every citizen may freely speak, write and publish his sentiments on any subject, being responsible for the abuse of this liberty...." Plaintiffs do not argue that this provision secures any rights beyond those secured by the first amendment. *See generally City of Portland v. Jacobsky,* 496 A.2d 646, 648–49 (Me.1985) (refused to extend state constitutional protection to obscene expression that did not enjoy federal constitutional protection).

the Constitution of Maine or laws of the State, has been interfered with, or attempted to be interfered with, as described in section 4681, may institute and prosecute in that person's own name and on that person's own behalf a civil action for legal and equitable relief.

5 M.R.S.A. §§ 4681–82 (Supp.1990). Although the Maine Act closely parallels the Massachusetts Civil Rights Act, it contains an additional requirement that the interference be intentional.

Plaintiffs argue that the Act was intended to provide an action against any party, private or governmental, for interference with the enjoyment or exercise of rights protected by the Constitution, even those rights that are traditionally protected only against governmental action. Plaintiffs contend that the Act is explicitly limited only by the requirements that the interference be intentional and that it be accomplished by threats, intimidation, or coercion. They concede that the first amendment may provide a constitutional defense to Colby for its actions, but argue that, in the abstract, the Act applies to all rights that emanate from the Constitution.

 "The 'fundamental rule' in statutory construction is that the legislative intent as divined from the statutory language controls the interpretation of the statute." *State v. Edward C.*, 531 A.2d 672, 673 (Me.1987). Words in the statute must be given their plain, common and ordinary meaning, unless the statute reveals a contrary intent. *Hewett v. Kennebec Valley Mental Health Ass'n*, 557 A.2d 622, 624 (Me.1989). If the meaning of a statute is clear and the result achieved by that meaning is not illogical or absurd, there is no reason to look beyond its words. *See Edward C.*, 531 A.2d at 673; *State v. Hopkins*, 526 A.2d 945, 950 (Me.1987).

The Act provides a remedy against persons, "whether or not acting under the color of law," who intentionally interfere with "rights secured by the United States

Constitution or laws of the United States, or of rights secured by the Constitution of Maine or laws of the State." The former phrase is unmistakably designed to provide a remedy for interference resulting from the acts of private parties. *E.g., Lugar v. Edmondson Oil Co. Inc.*, 457 U.S. 922, 928–32, 102 S.Ct. 2744, 2749–51, 73 L.Ed.2d 482 (1982) ("under color of state law" is the equivalent of "state action"). The Act, however, protects persons only from interference with "rights secured" by the constitutions and laws of the United States and Maine. The Supreme Judicial Court of Massachusetts, relying on a separate opinion of Justice Brennan in *United States v. Guest*, 383 U.S. 745, 778–79, 86 S.Ct. 1170, 1188–89, 16 L.Ed.2d 239 (1966), has construed the phrase "secured by" to mean "created by, arising under or dependent upon." *Bell v. Mazza*, 394 Mass. 176, 474 N.E.2d 1111, 1115 (1985) (quoting *Logan v. U.S.*, 144 U.S. 263, 293, 12 S.Ct. 617, 626, 36 L.Ed. 429 (1892). By way of contrast, the United States Supreme Court has interpreted the same phrase in a similar context as meaning "protected by." *Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 613–14 n. 29, 99 S.Ct. 1905, 1913–14 n. 29, 60 L.Ed.2d 508 (1979). Thus, under the interpretation adopted in Massachusetts, plaintiffs' rights of free expression and association, emanating from the Constitution, would be considered as "secured by" the Constitution for purposes of the Civil Rights Act.[2] Using the Supreme Court definition, however, a contrary result would occur because the first amendment protects those rights from governmental, rather than private, interference.

Plaintiffs argue that the Act was patterned on the Massachusetts Act, and that we should assume that the Maine Legislature was familiar with the interpretive rulings of the Massachusetts courts and presume that the Legislature intended to adopt those rulings. In our view, the legislative history provides no basis for indulging in such a presumption. The title of the

**2.** The Massachusetts court has limited the apparent sweep of the statute, as thus interpreted, by applying a restricted meaning for the terms threats, intimidation and coercion. *See, e.g.,*

*Bally v. Northeastern University*, 403 Mass. 713, 532 N.E.2d 49, 52–53 (1989). For a summary of the Massachusetts cases see Bedard, *Maine Civil Rights Act*, 6 Me.B.J. 76 (1991).

bill as originally presented to the Legislature was "An Act to Prevent, Punish and Remedy Violations of Constitutional Rights." L.D. 1253 (114th Legis.1989). The title of the enacted legislation was "Violations of constitutional rights; ...". 5 M.R.S.A. §§ 4681–82. The statement of facts attached to the law states, "The purpose of the bill is to provide public and private remedies for private property damage arising from the exercise of constitutional rights." L.D. 1253, *Statement of Facts* (144 Legis.1989). When the bill was heard before the Committee on the Judiciary, the National Lawyers Guild presented a written statement outlining the purpose of the bill. That statement emphasizes that the bill does not create new rights, but rather provides a means of protecting rights that already exist, rights that have been established by the Legislature, Congress, or the Constitution. Hearing on L.D. 1253 before the Committee of the Judiciary, 114 Legis. (1989) (Statement of Donald F. Fontaine, Esq.) (hereinafter Statement of Fontaine). The only recorded legislative debate consists of a statement made by a senator in support of the amendment adding the requirement that the interference be intentional: "The legislation before you would establish public and private remedies to vindicate violation of rights protected under the state and federal Constitution, which would prohibit discrimination in such areas as sounding on an ethnic, racial or religious bias." Legis.Rec. S–919 (1989). There is nothing in the legislative history that suggests that the Legislature was ever apprised of the fact that the Act was modeled on a similar law in Massachusetts, and there is even less reason to assume that the Legislature was made aware of the interpretive rulings of the Massachusetts Supreme Judicial Court. We decline to presume that the Legislature intended to adopt the gloss added to the plain words of the statute by the courts of Massachusetts. Considering both the language of the Act and the legislative history, it is evident that the Act was intended to remedy existing rights rather than create, for the first time, a right of free expression and free associa-

tion applicable to relationships between private parties.

The legal anomaly flowing from the Massachusetts gloss has been cogently described by Judge Coffin in an opinion of the United States Court of Appeals, First Circuit:

> The [Massachusetts Civil Rights Act] is an unusual statute, a civil rights law that abolishes the state action requirement for constitutional claims of deprivation of rights. This is not difficult to understand in the context of racial discrimination, the prohibition of which was the statute's primary object. *Redgrave [v. Boston Symphony Orchestra]*, 399 Mass. [93] at 105, 502 N.E.2d 1375 [ (1987) ]. There, it makes sense to treat private individuals similarly to the state, just as Title VII is designed as a "private" analogue to the non-discrimination provisions of the Constitution. But where the issue is the plaintiff's "right" to free speech, the analogy is strained. Such a right traditionally has content only in relation to state action—the state must be neutral as to all expression, and must not unreasonably restrain speech or expression. The right is to be free of state regulation, so that all private speech is formally on equal footing as a legal matter. In the traditional context, this means that various private actors can, without state interference, battle it out in the marketplace of ideas.
>
> In the present case, this application of the statute is made doubly unusual because, unlike in the typical discrimination case, there are free speech interests on the defendant's side of the balance as well. The plaintiff's statutory "free speech" right against the defendant is to be measured against the defendant's constitutional right against the state. If it were to enforce the statute, the state would be entering the marketplace of ideas in order to restrict speech that may have the effect of "coercing" other speech.
>
> We have grave concerns about the implications of such a conflict.... The freedom of mediating institutions, newspapers, universities, political associa-

tions, and artistic organizations and individuals themselves to pick and choose among ideas, to winnow, to criticize, to investigate, to elaborate, to protest, to support, to boycott, and even to reject is essential if "free speech" is to prove meaningful. The courts, noting that free speech guarantees protect citizens against governmental restraints upon expression, have hesitated to permit governments to referee disputes between speakers lest such mediation, even when it flies the banner of "protecting speech," interfere with the very type of interest it seeks to protect.

*Redgrave v. Boston Symphony Orchestra, Inc.*, 855 F.2d 888, 904 (1st Cir.1988) (footnotes omitted).

The interpretation adopted by the Superior Court, which we now approve, does not render the entire act duplicative and meaningless as the plaintiffs suggest, nor does it negate the intent of the Legislature. Not all substantive civil rights created by state and federal law are expressed in terms affording protection solely against governmental interference. For example, the federal Constitution protects the right to freely travel from state to state and be free from invidious racial discrimination by private actors. *United States v. Guest,* 383 U.S. 745, 759 (1966); *Griffin v. Breckenridge,* 403 U.S. 88, 104–105, 91 S.Ct. 1790, 1799–1800, 29 L.Ed.2d 338 (1971). Rights under the Maine constitution may arguably be protected against private actions. *See, e.g.,* Maine Constitution, article 1 § 3 (freedom of religion: " ... no one shall be hurt, molested or restrained in his person, liberty or estate for worshipping God in the manner and season most agreeable to the dictates of his own conscience ..."). Moreover, there are a number of laws that secure rights against private parties or, at least, do not specifically limit themselves to government infringement. *See, e.g.,* 5 M.R.S.A. §§ 4571 (right to freedom from discrimination in employment); 4581–82 (right to freedom from discrimination in housing); 4591–92 (right to freedom from discrimination in public accommodations); 4595–96 (right to freedom from discrimination in credit transactions); 4601

(right to freedom from discrimination in education).

We are mindful that our decision limits the potential utility of the Act as a means of combatting the actions of so-called hate groups. Moreover, there is reason to believe that the Maine Act grew out of concern about incidents of racism and bigotry. *See Bedard,* 6 Me.B.J. at 76, 77; Statement of Fontaine. Even the most intolerant members of our society, however, enjoy, subject to the limitations imposed by law, the right of free speech and association. The Maine Civil Rights Act stopped short of authorizing Maine courts to mediate disputes between private parties exercising their respective rights of free expression and association.

In an amicus brief, the Attorney General concedes that "there is considerable force to the Superior Court's observation that there is no indication in the legislative history of the Maine Civil Rights Act that the Legislature intended to create entirely new substantive rights when it enacted 5 M.R.S.A. §§ 4681–82." Without suggesting a change in the result of the present case, the Attorney General, however, poses the following hypothetical which he believes calls for the application of the law: Persons peacefully demonstrating along a public thoroughfare exercising their first amendment rights who are physically harassed or threatened by private citizens who object to the point of view being expressed by the demonstrators. In an effort to avoid the dilemma of either constitutionalizing private relationships or accepting the Superior Court opinion, the Attorney General suggests that we adopt the Massachusetts gloss "while at the same time restricting the reach of the statute by limiting its application to 'threats, intimidation, or coercion' which involves force or violence, the threat of force or violence, or other independently unlawful activity." However commendable that view might be, it suffices to note that the statute contains no language that would permit such a construction. Existing law makes it unlawful to resort to force, violence, or the threat of force or violence and specifies the available

remedies. If we adopted the Massachusetts *gloss,* and applied the remainder of the statute as it is written, we would ultimately be forced to mediate between two groups of peaceful demonstrators, both exercising their first amendment rights, if either intended to interfere with the other. The Maine Civil Rights Act does not envision that this Court will undertake such a task.

The entry is:

Judgment affirmed.

All concurring.