**STATE of Maine et al.**

v.

**CENTRAL MAINE POWER COMPANY.**

Supreme Judicial Court of Maine.

Argued Jan. 27, 1994.

Decided April 25, 1994.

Michael E. Carpenter, Atty. Gen., Paul Stern (orally), Asst. Atty. Gen., Augusta, for the State.

Gloria A. Pinza, Gerald M. Amero (orally), Pierce, Atwood, Scribner, Allen, Smith & Lancaster, Portland, for defendant.

Before WATHEN, C.J., and ROBERTS, GLASSMAN, CLIFFORD, RUDMAN and DANA, JJ.

WATHEN, Chief Justice.

Central Maine Power Company ("CMP") appeals from a judgment rendered by a single justice of the Supreme Judicial Court (*Collins, J.*) sitting in equity. Pursuant to a provision contained in a legislative charter, the Court determined the annual base rental to be paid by CMP for public land leased from the State. The land in question consists of public lots that form part of the dam and reservoir known as Flagstaff Lake. CMP contends that the Court erred as a matter of law in finding that the riparian rights remain appurtenant to the land leased from the State. CMP contends that it owns the water rights and that the value of those rights should not have been included in the assessment of annual rental for the land. Further, it contends that even if the value of the water rights is properly included in the rental, the Court relied on a flawed methodology in arriving at a fair and equitable annual rental of $527,858. We affirm the judgment.

In 1923, after overriding a veto by then Governor Baxter, the legislature chartered the Kennebec Reservoir Company ("KRC"), authorizing the state land agent to convey to the KRC public lands near Long Falls on the Dead River, for the purposes of building a dam for power generation and for facilitating log and lumber drives. P. & S.L.1923, ch. 74, §§ 3, 4 & 13. Significant public opposition to

the sale of the land arose after enactment, and the legislature subsequently repealed the law. In 1927 the legislature enacted P. & S.L.1927, ch. 113,[1] that mirrored an agreement achieved by Governor Baxter to lease the Long Falls Site to KRC and to authorize KRC to dam the Dead River to create a storage reservoir.[2] *Id.*

1. In relevant part, section 13 of the Act provides that:

> The state of Maine does hereby lease, demise and let unto said reservoir corporation the state, public or reserved lots in said township three, range four, in which the storage dams are to be located under section three of this act, and also such state, public or reserved lots as are flowed by the development hereinbefore provided for, to have and to hold the same for the term of fifty years from the date of filing this corporation, in the office of the secretary of state, its acceptance of this charter, which filing shall be construed to be an acceptance by the corporation of the terms of the lease, which are as follows:
> (a) The lessee shall pay therefor to the treasurer of the state an annual rental of twenty-five thousand dollars, payable on or before the thirtieth day of June of each year....
> (b) The state may retake the demised premises and all of the structures, rights, privileges and other properties of the lessee owned and used by it in the erection and operation of its storage reservoir under this charter, at the termination of this lease, paying therefore the net investment therein, which net investment shall not include any compensation for the value of franchises granted under this act and shall not exceed one-half the cost of dams then in existence plus the cost of other property and rights so taken; or this tenancy shall be renewed for such term and on such conditions ... as may then be deemed by the legislature and accepted by the corporation.... [If] the parties do not agree upon the terms of a renewal of the tenancy at least six months before the expiration hereof, this tenancy shall be deemed extended for the additional term of twenty years, in all respects like this lease except as to the amount of the annual rental.... Where the parties are unable to agree upon ... the rental that shall be charged for any further term or terms, either the corporation or the governor may apply by petition to any justice of the supreme judicial court, in equity, for the determination thereof in such a manner as the court may deem equitable and just, and said court is given equitable jurisdiction for such purpose.

> .     .     .     .     .

> (d) The lessee may allow water to be drawn from the dam for the purpose of developing power and may sublet any portion of the premises hereby demised for the construction and maintenance of canals, penstocks, power plants, transmission lines and other structures for the generation and transmission of power....
> (e) The state reserves to itself all rights to removal of timber and grass and all other rights to use of the premises hereby demised except in so far as such use will unreasonably interfere with the use of said premises for the purposes of this lease.
> (f) The right of the state to take over, maintain, and operate all the property of this corporation at any time by exercise of the power of eminent domain upon payment of just compensation therefor is expressly reserved.
> (g) For purposes of taxation the improvements placed upon the demised property by or under the corporation shall be deemed to be the property of the corporation.

> .     .     .     .     .

> The state of Maine covenants that it has power to lease the premises described in this section....

P. & S.L.1927, ch. 113, § 13.

2. Pursuant to section 3 of P. & S.L.1927, the KRC was:

> authorized and empowered to build dams and other necessary works and structures on Dead river, at or near the head of Long Falls, near the southeasterly corner of township three, range four, in the county of Somerset, for the purposes of creating storage basins and reservoirs to retain and control the waters of Dead river and the tributaries thereof, thereby increasing and making more constant the flow of water in the Kennebec river, for use at all seasons of the year for manufacturing and power purposes on said Kennebec river and for facilitating the driving of logs and lumber on Dead river. And in order to facilitate the driving of logs and lumber down said Dead river without unnecessary waste of water, said corporation is authorized to build and maintain dams, side dams, sheer booms, remove rocks, make embankments and other improvements on said Dead river from the location of its reservoir dams to its union with the Kennebec river.

P. & S.L.1927. ch. 113, § 3. Section 4 authorized the KRC:

> by means of its said works to hold, store and retain said waters in any reservoir or storage basin so created, and to discharge and release the same and control the volume and flow thereof for the uses and purposes and subject to the restrictions aforesaid. It may make such reasonable rules and regulations as may be deemed necessary for the most advantageous use thereof, and is authorized to contract with owners and users of water power benefitted by said development for defraying the cost thereof in any manner which may be agreed upon.

P. & S.L.1927, ch. 113, § 4.

Although no construction was undertaken, in 1937 the legislature amended and extended the KRC charter so that:

> if and when [CMP] purchases the rights, privileges, franchises and properties of [KRC] as provided for in this act, the state of Maine hereby consents to the assignment and transfer to said [CMP] of the lease of the state, public or reserved lots, which lease is contained in section 13 of the charter of said [KRC] and is section 13 of chapter 113 of the private and special laws of the state of Maine for the year 1927; and if and when said lease is so assigned and transferred to [CMP] it shall be and become the lessee thereunder in substitution for said [KRC] in the same manner as though said lease were originally granted to it.

P. & S.L.1937, ch. 62, § 6. CMP finally acquired KRC's lease in 1940 and, pursuant to section 13(b) of the original charter, has paid the $25,000 annual rental since 1941. During the late 1940s and early 1950s, CMP built a dam at Long Falls, creating Flagstaff Lake that extends 27 miles upstream and covers 17,600 acres. This storage project presently generates an increment of 83,663,000 kilowatt-hours (kWh) per year to nine downstream generating plants. CMP owns four of the plants outright, and a portion of a fifth plant. All nine plants are parties to the Kennebec River Headwater Benefits Agreement, under which each pays its proportionate share of the Flagstaff Project's expenses.

As the expiration date of the original lease approached, CMP sought a twenty-year extension. Negotiations failed, so the lease automatically renewed for an additional twenty year term pursuant to section 13(b). Governor McKernan petitioned the Supreme Judicial Court for a determination of a fair and equitable rental by a single justice.

The proceedings before the court consisted of a ruling on a motion for a partial summary judgment and a determination of a fair and equitable rental from testimony submitted by affidavit. The Court ruled as a matter of law

that "[a]ll riparian and water rights relating to the flow of the Dead River through the leased property are appurtenant to the leased land and, therefore, remain the property of the State and are not owned by CMP by virtue of their ownership of the dam,"[3] and arrived at its determination of rental based on the evidence before it. CMP appeals.

### I.

█ Although the parties did not challenge the jurisdiction of the single justice, the unusual nature of the proceeding requires our consideration. Section 13(b) of the 1927 Act provides that if the parties do not agree on the terms of the lease renewal six months before the lease expires, it automatically renews on its original terms except as to the amount of the annual rental. P. & S.L.1927, ch. 113, § 13(b). Either party may then "petition to any justice of the supreme judicial court, in equity, for the determination thereof...." *Id.*

In *Curtis v. Cornish*, 109 Me. 384, 385, 84 A. 799 (1912), we were presented with a statute that established a special and separate tribunal composed of Superior Court and Supreme Judicial Court justices to hear claims of corrupt practices in public elections. The statute conferred authority on the Chief Justice of the Supreme Judicial Court to designate members of that special tribunal. *Id.* at 390–91, 84 A. 799. We invalidated the statute because Maine's Constitution forbids justices to also be members of inferior courts and because only the executive has the appointive power. *Id.* at 391–392, 84 A. 799. The legislative charter involved in this case does not establish a separate tribunal, nor does it require the Chief Justice to appoint a justice to an inferior court. Section 13(b) properly invokes the equitable jurisdiction of the Supreme Judicial Court acting through a single justice. *See id.* at 392, 84 A. 799.

### II.

█ On the merits, CMP first argues that the Court erred as a matter of law in holding

---

**3.** The partial summary judgment order also found that CMP owns all the dams, buildings, and other structures that it built on the leased property, that CMP owns 90% of the land under the reservoir, and that the State retains ownership of the leased public land flooded when CMP built the dam.

that the water rights were owned by the State. CMP contends that the legislative charter leases the land, but grants outright a franchise to control and regulate the flow of the Dead River. Under its analysis, the value of the storage and flowage rights would not be included in the assessment of rent.

■ The meaning of legislation is derived from the language of the enactment:

> The fundamental rule in statutory construction is that the legislative intent as divined from the statutory language controls the interpretation of the statute. Words in the statute must be given their plain, common and ordinary meaning unless the statute reveals a contrary intent. If the meaning of a statute is clear and the result achieved by that meaning is not illogical or absurd, there is no reason to look beyond its words.

*Phelps v. President and Trustees of Colby College*, 595 A.2d 403, 405 (Me.1991) (citations omitted). Furthermore, legislative franchises to persons or corporations are never construed to extend beyond the plain terms in which they are conferred. *Davis v. Mattawamkeag Log Driving Co.*, 82 Me. 346, 350, 19 A. 828 (1890). In *Davis*, a dam company that received legislative authority to erect and maintain a dam at a specific location, constructed a dam four or five miles above that location. We held that it had exceeded its authority and could build a dam only at the specific location authorized by legislative charter; the presumption being that the legislature conferred only those rights it expressed. *Id.* at 350–51, 19 A. 828. We also held that legislative silence negates

intent and that every reasonable doubt must be resolved in favor of the State. *Id.* In modern times we have continued to hold that when the State grants public rights to an entity, it will be presumed to have conveyed no more than is necessary to achieve its purpose. For example, in *Cushing v. State*, 434 A.2d 486, 500 (Me.1981), we refused to infer the right to cut future growth from language in deeds conveying the right to cut timber and grass from public reserved lots.

Here, section 13 of the legislative charter expressly refers to a lease of the public land and the appurtenant right to draw water for the purpose of generating power. CMP notes that it does not generate power on site, and argues that all "remaining water rights" were *granted* to it under sections 3 and 4, which authorize the construction of a dam and reservoir. Even if we were to accept the distinction drawn by CMP, neither section 3 nor 4 contains words of grant. There is nothing in either section that would lead us to conclude that the legislature intended to authorize CMP to use public water rights other than in furtherance of its lease of public lands. We can only assume that the legislature specifically authorized the interference with the flow of the river so that the use of the leased land for its intended purpose would not constitute a public nuisance. *See Knox v. Chaloner*, 42 Me. 150, 156 (1856). Accordingly, the court did not err in ruling that the water rights remain State property.[4]

### III.

■ CMP next contends that the Court erred as a matter of law in choosing the

---

4. CMP further argues that the language of section 13(b) shows that it owns the storage reservoir and the rights appurtenant to it. Section 13(b) states that:

> the State may retake the demised premises and all of the structures, rights, privileges and other properties of the lessee owned and used by it in the erection and operation of its storage reservoir....

P. & S.L.1927, ch. 113, § 13(b). CMP argues that "its" refers to CMP and shows the intent to convey the reservoir to it. The Court ruled and appellee argues that the "its" refers to the State. Although we agree with CMP's interpretation, it does not change the outcome. Section 12 authorizes CMP to acquire land for the reservoir. No one disputes that CMP owns 90% of the reservoir land. The Court's determination of fair and eq-

uitable rent acknowledges that fact and does not permit the state to receive rent for any benefits attributable to CMP's land.

Likewise, we reject CMP's argument that it owns the storage rights by virtue of its ownership of the dam. The cases that CMP relies on hold that ownership of the site (not of the dam) conveys ownership of the appurtenant water rights. *Ashwander v. Tennessee Valley Auth.*, 297 U.S. 288, 330, 56 S.Ct. 466, 475, 80 L.Ed. 688 (1935) (by acquiring full title to the dam site, government acquired appurtenant riparian rights); *Ring v. Walker*, 87 Me. 550, 561–62, 33 A. 174 (1895) (deeded easement permitted defendant to maintain log sluice through plaintiff's property); *Hathorn v. Stinson*, 10 Me. 224, 233 (1833) (where owner conveys mill site and its appurtenant rights, grantee has right to flow).

methodology for calculating a fair rental. Although the Court has never before determined a fair rental under the Flagstaff laws, we have established general principles for reviewing "rate" determinations. We grant property assessors considerable leeway in choosing the method or combination of methods to achieve just valuations, and review the assessors' valuations to test whether the methods used were reasonable. *Shawmut Inn v. Inhabitants of Kennebunkport*, 428 A.2d 384, 390 (Me.1981). Similarly we review Public Utility Commission (PUC) rate determinations by focusing on the reasonableness of the result reached and not on the methodology applied, *New England Tel. & Tel. Co. v. Public Utilities Comm'n*, 390 A.2d 8, 32 (Me.1978), and the Federal Energy Regulatory Commission (FERC) reviews rate determinations for reasonableness. *Portland Gen. Elect. Co., No. 2030*, 20 F.E.R.C. ¶ 61,294 at p. 61,562 (1982). The Court has considerable discretion in choosing methodology and we review its determination for reasonableness.

The evidence concerning the rental value of the lease may be summarized as follows: The State presented Dr. Gordon Taylor, who worked for FERC and served as an expert in negotiations to establish reasonable annual charges for Kerr, Round Butte, and Grand Coulee Dams. Dr. Taylor employed four methods for determining a fair rental in this case, the net benefits approach, the Pelton indexing method (the "maintenance approach"),[5] the takeover approach, and the comparable sales method. The net benefits approach measures rental value as equal to the net benefits of the project. Dr. Taylor calculated the net benefits by subtracting the "avoided costs" of having to replace the power generated by the project from the total benefits of the project, and then divided the net benefits equally between the landowners and the ratepayers. He allocated 66.7% of the 50% allocated to the landowners to the dam site, and 33.3% of the 50% to the reservoir site. He assigned greater value to the dam site because of its unique attributes and its associated riparian and water power rights. The State owns 100% of the dam site and 10% of the reservoir site, entitling the State to 35.02% of the net benefits, which equals an estimated rental of $360,000.

The Pelton indexing approach (the name Dr. Taylor assigned to FERC's maintenance approach) yielded a fair rental of $744,000 in 1993. To arrive at that figure, he compared the 1940 costs of Flagstaff ($0.00344/kWh) to the costs of the 1940 next best alternative project ($0.00598/kWh). He multiplied both

---

5. Each expert witness relied to some extent on the maintenance approach adopted by FERC in the Pelton Dam cases. *Portland General Electric Company, No. 2030*, 12 F.E.R.C. ¶ 63,055 (1980); *Portland General Electric Company, No. 2030*, 15 F.E.R.C. ¶ 61,237 (1981); *Portland General Electric Company, No. 2030*, 17 F.E.R.C. ¶ 63,058 (1981); *Portland General Electric Company, No. 2030*, 20 F.E.R.C. ¶ 61,294 (1982). Under this approach, the factfinder must determine if the original annual rental is reasonable. *Portland General Electric Company, No. 2030*, 20 F.E.R.C. ¶ 61,294 at p. 61,568 (1982). If reasonable, the original rental is indexed to its present value, using the Consumer Price Index (CPI) to adjust for inflation. *Id.* The adjusted rental represents the base rental. *Id.* Annually the CPI is applied to the base rental to determine reasonable annual rental over the lease renewal period. *Id.* If the original charge is unreasonable, then the factfinder must determine a proper base rental and may do so using the net benefits approach. *Id.* at p. 61,569–61,570. The net benefit is the difference between the cost of the original dam and the cost of the next best alternative project from the same time period. Once calculated, the net benefit is indexed forward using the CPI to determine the reasonable base rental charge, and then is adjusted annually using the CPI. *Id.* at p. 61,570–61,571.

To determine what portion of the net benefits the lessor may receive as rent requires calculating what percentage of the benefits is attributable to the leased land. First the net benefits are divided in half, with 50% allocated to the landowners and 50% allocated to the ratepayers who financed the project. *Portland General Electric Co. No. 2030*, 12 F.E.R.C. ¶ 63,055 at p. 65,231 (1980). The landowner share is then allocated among the various landowners according to the percentage of project land that each owns. *Id.* For Pelton Dam, the administrative judge did a straight allocation because the lessor owned one side of the dam and one side of the reservoir. *Id.* In another case, *Montana Power Company v. F.P.C.*, 459 F.2d 863 (D.C.Cir.), *cert. denied* 408 U.S. 930, 92 S.Ct. 2497, 33 L.Ed.2d 343 (1972), FERC assigned different values to the land underlying the dam and the land underlying the reservoir because the dam and reservoir were separately owned and each contributed different and identifiable water flow for generation. *Portland General Electric Company, No. 2030*, 12 F.E.R.C. ¶ 63,055 at p. 65,231.

figures by the amount of kWh produced by Flagstaff, 83,663,000 kWh. The difference between the cost of the alternative and the cost of Flagstaff yielded a net benefit in 1940 of $212,000. Multiplying 35.02% (the State's portion of the net benefits) by $212,000 equals $74,418 in 1940 dollars; indexing this sum, using the consumer price index, results in a fair rental in 1993 of $744,000.

The takeover method measures the rental as the net revenue the State could obtain by retaking the Flagstaff Project,[6] then renting it to CMP. Using the takeover method, he established an annual rental of $1,028,000.

Finally, the comparable sales method examines other FERC licensed hydroelectric projects to determine their per kilowatt-hour cost of production. That figure is then multiplied by the output of the Flagstaff project to determine a comparable rent. Dr. Taylor compared Flagstaff to Round Butte Dam and Kerr Dam. Kerr Dam has 168 megawatts (MW) of installed generating capacity, while Flagstaff supplies energy for 143 MW of installed generating capacity downstream. Dr. Taylor calculated that the lessors of the Kerr site are entitled to 41.68% of the landowner share of the net benefits, compared to the State's share of 32.05% of Flagstaff's net benefits. So he used a ratio of the two percentages to scale down the amount received by the lessors and arrived at an annual comparable rent of $735,000. Applying the same methodology to Round Butte, which has 344.3 MW of installed generating capacity, yielded a comparable rent of $920,000. Based on his calculations, Dr. Taylor recommended a fair rental of $735,000, the lowest of the three estimated rental values grouped between the high of $1,028,000 and the low of $360,000.

The State also presented Dr. Gordon Weil, a consultant in the fields of energy and utilities whose experience includes serving as Director of Maine's Office of Energy and Resources and as Maine's first Public Advocate. Dr. Weil used the avoided costs method to calculate the net benefits of Flagstaff,

which he determined to be $21,208,714. He defined avoided costs as the difference between the cost of Flagstaff and the rate CMP would pay to other sources to replace the power from Flagstaff. Dr. Weil stated that FERC did not advocate this method in the Pelton Dam cases because it came into vogue about ten years after those decisions were issued. He opined that the method is consistent with the Pelton method and produces a lower lease fee than the facilities comparison method.

He allocated the $21,208,714 benefit using the FERC approach: 50% to ratepayers and 50% to landowners, and equally divided the 50% attributable to the landowners between the dam and reservoir site. The State owns the dam site and is entitled to that 25%, plus the State owns 10% of the reservoir site and is entitled to 2.5% of the 25% attributable to that site. Multiplying 27.5% by the 50% of net benefit allocated to the landowners equals $5,832,396 (this sum represents the total benefit that the State is entitled to receive). Applying an inflation index to that amount and dividing it over the twenty year lease life, he arrived at an annual rental of $539,886.

CMP presented Mr. David Moody, a professional engineer registered in Maine and a real estate appraiser certified in New Hampshire and Massachusetts. Mr. Moody has experience working for CMP and as an appraiser of utility and manufacturing properties. He concluded that if the storage rights are owned by CMP, the leased land has nominal value, and if the storage rights are leased to CMP, the fair annual rent for Flagstaff is $36,030 per year.[7] To arrive at that figure, Mr. Moody used the avoided costs method. Rather than comparing the existing dam to the avoided costs like Dr. Weil, Mr. Moody compared the costs of constructing a new dam in 1990 with existing avoided costs. The comparison between the 1990 cost of the hypothetical new dam and the avoided costs of purchasing electricity from downstream sources produced a net present value of

---

6. Section 13(b) permits the State to retake the Flagstaff Project by paying CMP the equivalent of its net investment in the project. P. & S.L.1927, ch. 113, § 13(b). *See supra* n. 1.

7. By way of comparison, the original $25,000 lease payment indexed forward equals $255,577 in 1990 dollars.

$6,345,284 in total benefits. Like the other experts, Mr. Moody divided this net benefit equally between ratepayers and landowners. Then, he divided the 50% assigned to landowners on a straight allocation basis, reasoning that because no power is generated at the dam site (but rather is generated downstream), no special value should be given to the dam site. He assigned 10.03% of the total value, or $340,230, to the State. Mr. Moody did not apply an inflationary index to the base figure. Instead, he opined that the proper market rental rate of return is 10.-59%, and 10.59% multiplied by $340,230 yields an annual rent of $36,030.

After considering the evidence, the Court ordered that the fair rental, commencing December 14, 1990 (the lease renewal date), be set at $527,858, to be adjusted annually using the consumer price index. In arriving at that figure, the Court adopted a combination of the net benefits method and the indexing method advocated in the Pelton Dam cases. Comparing the 1940 costs of Flagstaff ($0.00344/kWh) with the costs of the next best alternative ($0.00598/kWh), the Court multiplied the difference between the two figures ($0.00254/kWh) by the total power attributable to Flagstaff (83,663,000 kWh) to arrive at a total net benefit of $212,504 in 1940 dollars. The court then divided this amount equally between the ratepayers and the landowners, adopting Dr. Weil's landowner allocation. Accordingly, the Court assigned 27.5%, or $58,439 in 1940 dollars, of the total benefits to the State. Having arrived at that figure, the Court held that the original rent of $25,000 was not reasonable and that the new base rental would be $58,-439 in 1940 dollars. Applying the consumer price index to that base resulted in a 1990 annual fair market rent of $527,858.

Presented with expert testimony establishing a range of rentals from $36,000 to $1,028,000 annually, with most figures clustered between $539,886 and $920,000 annually, the Court did not abuse its discretion in establishing an annual rental of $527,858. CMP's contentions with respect to methodology and the reasonableness of the result are without merit.

The entry is:

Judgment affirmed.

All concurring.