STATE OF MAINE
CUMBERLAND, ss

STEPHEN A. FECTEAU,
et al.,

　　　　　Plaintiffs

v.

SPRING HARBOR
HOSPITAL, et al.,

　　　　　Defendants

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. CV-10-649
*NM-CUM-2/28/2014*

ORDER ON MOTION FOR
SUMMARY JUDGMENT

Before the Court is the defendants' motion for summary judgment. Defendants allege that they are immune from suit under the Maine Tort Claims Act. 14 M.R.S. § 8103(1) (2013). For the following reasons, the motion is denied.

BACKGROUND

Kathryn Fecteau suffered from depression for much of her adult life. (Opp. S.M.F. ¶ 39.) On 2/27/10, Ms. Fecteau presented for voluntary admission to Spring Harbor Hospital through the Maine Medical Center Emergency Department. (Opp. S.M.F. ¶ 43.) Ms. Fecteau was admitted as a voluntary patient and payment for her admission was authorized by her CIGNA health insurance. (Opp. S.M.F. ¶ 45.)

Defendant Dr. Daria Hanson first saw Ms. Fecteau at Spring Harbor on 3/1/10. (Opp. S.M.F. ¶ 46.) During that first visit, Dr. Hanson noted that Ms. Fecteau was depressed and had suicidal thoughts. (Opp. S.M.F. ¶ 46.) Ms. Fecteau expressed an interest in electroconvulsive therapy ("ECT") to treat her depression. (Opp. S.M.F. ¶ 46.) During the next five days after that first visit, Dr. Hanson took steps to enroll Ms. Fecteau in ECT. (Opp. S.M.F. ¶ 47.) Dr. Hanson

consulted another psychiatrist at Spring Harbor for a second opinion about Ms. Fecteau; the other psychiatrist concluded that ECT was not an unreasonable treatment option. (Opp. S.M.F. ¶ 48.)

On 3/5/10, Dr. Hanson told Ms. Fecteau that she was scheduled to begin ECT treatment at Maine Medical Center on 3/8/10. (Opp. S.M.F. ¶ 49.) Shortly before the ECT treatment was scheduled to begin on 3/8/10, the treatment was cancelled because of medical concerns. (Opp. S.M.F. ¶ 50.) The plaintiffs' allegation that the "cancellation had nothing to do with any change in psychiatric diagnosis" is not supported by the record citation. (Opp. S.M.F. ¶ 51; Reply S.M.F. ¶ 50.)

After the ECT was cancelled, Ms. Fecteau became angry, disappointed, and dysregulated. (Opp. S.M.F. ¶ 52.) She returned to her room, tied a sheet around her neck, and attempted to suffocate herself with a pillow. (Opp. S.M.F. ¶ 52.) After this incident, Ms. Fecteau was placed on one-on-one observation. (Opp. S.M.F. ¶ 53.) When William Gelinas, a physician's assistant, met with Ms. Fecteau later that morning, she demanded to be discharged from Spring Harbor. (Opp. S.M.F. ¶ 54.)

Mr. Gelinas recorded a diagnosis of "Major Depressive Disorder, recurrent, severe, without psychotic features. Consider Anxiety Disorder, [Not Otherwise Specified], PTSD, chronic symptoms." (Opp. S.M.F. ¶ 54.) He concluded that Ms. Fecteau required extended involuntary commitment because she posed a risk of harm to herself. (Opp. S.M.F. ¶ 54.) Mr. Gelinas ordered the preparation of an application for involuntary commitment and signed the order

2

as the certifying examiner.[1] (Opp. S.M.F. ¶ 55.) Later in the day on 3/8/10, Ms. Fecteau required a floor hold and restraint and again was placed on one-on-one observation. (Opp. S.M.F. ¶ 56.) The following day, she revoked her authorizations for Spring Harbor to speak with her family members. (Opp. S.M.F. ¶ 57.)

On 3/10/10, Ms. Fecteau agreed to participate in a treatment meeting the following day with her husband, daughter, and Dr. Hanson. (Opp. S.M.F. ¶ 58.) At the meeting, Dr. Hanson read to them the criteria for the diagnosis of borderline personality disorder; Dr. Hanson felt that diagnosis described Ms. Fecteau. (Opp. S.M.F. ¶ 59; Reply S.M.F. ¶ 59.) Dr. Hanson stated that borderline personality disorder would not respond well to ECT treatment. (Opp. S.M.F. ¶ 61.) Ms. Fecteau screamed and hollered during the meeting. (Opp. S.M.F. ¶ 62; Reply S.M.F. ¶ 62.)

On 3/10/10 at 1:30 p.m., Dr. Hanson initiated the "white paper" process to continue Ms. Fecteau's involuntary admission.[2] (Opp. S.M.F. ¶ 63.) Following the treatment meeting, Ms. Fecteau remained angry and focused on discharge. (Opp. S.M.F. ¶ 64.) Ms. Fecteau told Dr. Hanson, "I could pretend to be better and just leave here and kill myself." (Opp. S.M.F. ¶ 64.) Following that conversation, Dr. Hanson allowed Ms. Fecteau to remain in her room with checks every fifteen minutes. (Opp. S.M.F. ¶ 65.) While alone in her room, Ms. Fecteau hanged herself with the shower curtain in her room. (Opp. S.M.F. ¶ 67.) She was pronounced dead on 3/11/10 at 9:25 p.m. (Opp. S.M.F. ¶ 70.)

---

[1] Under 34-B M.R.S. § 3863(2) (2013), an application for involuntary commitment must be accompanied by a certifying examination signed by a medical practitioner.
[2] Under 34-B M.R.S. § 3863(5-A), to continue hospitalizing an involuntarily admitted patient for longer than three days, the hospital must get a court order under section 3864.

3

PROCEDURAL HISTORY

In the notice of claim filed 12/23/10 and the complaint filed 10/29/12, the plaintiffs allege Dr. Hanson and Spring Harbor Hospital, through its agents and employees, breached the applicable standard of care in the treatment and care of Ms. Fecteau. They allege Ms. Fecteau endured conscious pain and suffering and the heirs have been damaged. Defendants moved for summary judgment on 9/6/13 on all counts of the complaint.

DISCUSSION

1. Standard of Review

"Summary judgment is appropriate when there is no genuine issue of material fact that is in dispute and, at trial, the parties would be entitled to judgment as a matter of law." Fitzgerald v. Hutchins, 2009 ME 115, ¶ 9, 983 A.2d 382. "An issue is genuine if there is sufficient evidence supporting the claimed factual dispute to require a choice between the differing versions; an issue is material if it could potentially affect the outcome of the matter." Brown Dev. Corp. v. Hemond, 2008 ME 146, ¶ 10, 956 A.2d 104. Defendants have the burden to establish that their affirmative defense bars plaintiffs' claim. See Baker v. Farrand, 2011 ME 91, ¶ 31, 26 A.3d 806 ("[D]efendant asserting the affirmative defense of a statute of limitations has the ultimate burden of establishing without dispute as to a material fact that the cause of action accrued outside of the limitations period.").

2. Discovery Related to Defendants' Affirmative Defense

Plaintiffs contend that, despite their discovery requests, the documents related to the defendants' affirmative defense of immunity were not provided to them until the defendants filed their motion for summary judgment. The

4

plaintiffs requested in discovery all documents related to any affirmative defense the defendants planned to assert in the case. (Opp. S.M.F. ¶ 92.) Defendants' response first referenced previously filed objections and then stated that the materials would be provided "according to the Panel Chair's Scheduling Order and the Maine Rules of Civil Procedure." (Opp. S.M.F. ¶ 93.) Defendants originally objected that the request was premature and called for disclosure of attorney work product protected by M.R. Civ. P. 26(b)(3). (Reply S.M.F. ¶ 93.) Defendants now argue the documents were not withheld in bad faith and the discovery request did not identify the requested documents with "reasonable particularity" as required by M.R. Civ. P. 34(b). (Reply S.M.F. ¶ 93.)

In his affidavit, defendants' attorney Christopher Taintor states he hoped he would be able to locate a signed contract between Spring Harbor Hospital and DHHS. (Reply S.M.F. ¶ 93; Taintor Aff. ¶¶ 6-8.) Attorney Taintor states it was not until late August 2013 that he decided he would have to file a summary judgment motion without having a copy of any signed agreement. (Reply S.M.F. ¶ 93; Taintor Aff. ¶ 8.) Because of this failure to find any signed agreement, Attorney Taintor attached to his motion other documents that would help prove a contract between Spring Harbor Hospital and the DHHS existed. (Reply S.M.F. ¶ 93; Taintor Aff. ¶¶ 7-8.) These documents were never provided to the plaintiffs during discovery. (Opp. S.M.F. ¶ 94.)

Attorney Taintor first began the effort to locate a signed agreement in September 2012. (Reply S.M.F. ¶ 93; Taintor Aff. ¶ 3.) It is unclear why nearly one year later, Mr. Taintor continued to hope a signed contract would be located. (Reply S.M.F. ¶ 93; Taintor Aff. ¶¶ 6-8.) The discovery period ended on 8/7/13. (12/7/12 Scheduling Order.) The documents attached to the defendants' motion

5

were located before this deadline but not produced. (Reply S.M.F. ¶ 93; Taintor Aff. ¶¶ 4, 6-7.)

Defendants argue further the plaintiffs' discovery request was improper under the rules. The defendants rely on federal cases interpreting the reasonable particularity requirement. See, e.g., Seifried v. Portfolio Recovery Assocs., LLC, No. 12-CV-32-JHP, 2013 WL 3340685 (E.D. Okla. July 2, 2013). In Seifried, the plaintiffs requested "Any and all documents in the possession or control of Defendant which any of Defendant's claims are in any way relevant to the subject matter of the instant lawsuit." Id. at *5. The court determined this request was impermissibly broad and unspecific. Id. at *5. In this case, the plaintiffs' request was more narrow. Further, the defendants did not make during the discovery period the objection they now assert. Instead, the defendants responded that they would comply with the request within the time limits required by the rules and the court's scheduling order. (Opp. S.M.F. ¶ 93.)

In Longley v. Knapp, the Longleys filed a motion for summary judgment after the discovery period ended and included affidavits and materials "not revealed during the discovery period although the evidence fell squarely within Knapp's discovery requests." Longley v. Knapp, 1998 ME 142, ¶ 6, 713 A.2d 939. The Law Court determined the trial court acted within its discretion in excluding the evidence, a sanction that reflected the plaintiffs' bad faith and prejudice to the defendant. Id. ¶ 8. In this case, the defendants agreed to produce the documents and did not.

In this case, the court previously ordered a hearing on sanctions for defendants' failure to produce documents in this case in spite of three orders for production. See 3/12/13 Order. By letter to the court dated 3/18/13, the

6

plaintiffs informed the court they did not agree that sanctions were in order because "Spring Harbor acted to assert a strongly-held view of the law." (3/18/13 Letter.) Plaintiffs requested the court reconsider its order; accordingly, no sanctions were ordered

Regarding this second instance of defendants' failure to produce documents in a timely manner, plaintiffs argue "[t]here is no excuse for Defendants' failure to produce these documents during the course of discovery." (Pls.' Brief at 18.) The Court defers the issue of sanctions until trial and until any motions in limine are filed. See Longley, 1998 ME 142, ¶ 7, 713 A.2d 939 ("Sanctions may serve to penalize non-compliance, remedy the effects of non-compliance, and to serve as a deterrent.").

3. Involuntary Commitments and Immunity

Defendants claim they were acting as government employees in treating Ms. Fecteau after she was involuntarily held at Spring Harbor Hospital. They claim they are immune from suit under 14 M.R.S. § 8103 (2013), which provides: "Except as otherwise expressly provided by statute, all governmental entities shall be immune from suit on any and all tort claims seeking recovery of damages." 34-B M.R.S. § 3861 provides the following for a nonstate mental health institution: "The institution, any person contracting with the institution and any of its employees when admitting, treating or discharging a patient under the [involuntary commitment provisions] under a contract with the department, for purposes of civil liability, must be deemed to be a governmental entity or an employee of a governmental entity under the Maine Tort Claims Act." 34-B M.R.S. § 3861(1) (2013).

7

a. Common Law Immunity

Prior to the enactment of 34-B M.R.S. § 3861, the Law Court extended immunity to a psychiatrist employed by a nonstate mental health hospital who examined an individual pursuant to the involuntary commitment statute at the request of the Cumberland County jail. Taylor v. Herst, 537 A.2d 1163, 1164 (Me. 1988). The Taylor Court found that even though the doctor is not a state employee, "he is acting in an official capacity on behalf of the State when performing the task of determining, for involuntary commitment purposes, whether a 'person is a mentally ill individual and because of his illness, poses a likelihood of serious harm.'" Id. at 1165. In a similar case, the Law Court determined that a psychiatrist at Maine Medical Center was immune from suit when deciding whether a patient "should be either involuntarily committed or voluntarily admitted to AMHI." Clark v. Me. Med. Ctr., 559 A.2d 358, 360 (Me. 1989). Although the doctor in Clark was not acting under any statute, the court determined the patient "went to MMC solely because AMHI procedures required it, and that the only diagnosis and treatment sought was admission to AMHI." Id. at 360.

Taylor and Clark apply only to medical practitioners making the initial determination of whether a patient should be involuntarily committed. The cases do not address the issue of immunity for institutions that provide care to involuntarily admitted patients.

In this case, Ms. Fecteau was admitted under the emergency procedures in 34-B M.R.S. § 3863.[3] (Supp. S.M.F. ¶¶ 22-23.) The common law immunity under

---

[3] The record does not show whether the hospital obtained a judge's endorsement for the emergency involuntary commitment within 24 hours as required by the statute. See In re

8

Taylor and Clark does not apply because the hospital admitted Ms. Fecteau and continued to treat her after her emergency involuntary admission.

b. Statutory Immunity

Soon after Clark was decided, the legislature enacted 34-B M.R.S. § 3861, which provides:

> 1. **Nonstate mental health institution.** The chief administrative officer of a nonstate mental health institution may receive for observation, diagnosis, care and treatment in the institution any person whose admission is applied for under any of the procedures in this subchapter. An admission may be made under the provisions of section 3863 only if the certifying examination conducted pursuant to section 3863, subsection 2 was completed no more than 2 days before the date of admission.
>> A. The institution, any person contracting with the institution and any of its employees when admitting, treating or discharging a patient under the provisions of sections 3863 and 3864 under a contract with the department, for purposes of civil liability, must be deemed to be a governmental entity or an employee of a governmental entity under the Maine Tort Claims Act, Title 14, chapter 741.

A "nonstate mental health institution" is defined as "a public institution, a private institution or a mental health center, which is administered by an entity other than the State and which is equipped to provide inpatient care and treatment for the mentally ill." 34-B M.R.S. § 3801(6). This is contrasted with a "designated nonstate mental health institution," which is defined as "a nonstate mental health institution that is under contract with the department for receipt by the hospital of involuntary patients." 34-B M.R.S. § 3801(1-A). Immunity is granted only to "designated nonstate mental health institutions," institutions that receive involuntary patients "under a contract" with the DHHS.

---

Marcia E., 2012 ME 139, ¶ 6, 58 A.3d 1115 ("Under no circumstances may a hospital hold a person against his or her will for longer than twenty-four hours unless the hospital has obtained a judge's endorsement.").

9

In <u>Lever v. Acadia Hospital Corp.</u>, the Law Court explained the origin of the "contract" language in the law:

> The "contract" language in the original bill was not discussed at all in the original Statement of Facts. The first reference to the "contract" language appears in a Fiscal Note to an amendment which substantially rewrote the language from the original draft bill. It notes that the Department of Mental Health and Mental Retardation "will not contract with any facility that would incur costs beyond those able to be reimbursed within the department's resources." The revised Statement of Facts with this amendment indicates that the amendment "applies specified provisions of the Maine Tort Claims Act to hospitals accepting involuntary commitments of mental patients under a contract with the Department of Mental Health and Mental Retardation."

<u>Lever v. Acadia Hosp. Corp.</u>, 2004 ME 35, ¶ 17, 845 A.2d 1178 (internal citations omitted). The legislative history behind this section further "notes in part that the purpose of the legislation was 'to facilitate the admission of involuntary patients to community hospitals with psychiatric units in order to relieve overcrowding at state mental health institutions.'" <u>Id.</u> ¶ 16. In <u>Lever</u>, the Law Court found "this limited legislative history speaks exclusively of commitments, and expanding the ability of private hospitals to accept involuntarily committed patients." <u>Id.</u> ¶ 18. Similarly, in <u>Doe v. Graham</u>, the Law Court reiterated that "the statute's express grant of governmental status to facilities 'under a contract' with the Department of Health and Human Services is intended to encourage nonstate hospitals to accept committed patients by encompassing those facilities within the provisions of Tort Claims Act Immunity." <u>Doe v. Graham</u>, 2009 ME 88, ¶ 11, 977 A.2d 391.

4. <u>Existence of a Contract</u>

10

The primary issue is whether Ms. Fecteau was involuntarily admitted "under a contract with the department."[4] If yes, the hospital and its staff must be may be government employees. If no, the private hospital and its staff are not government employees.

Defendants are unable to produce a signed written contract between Spring Harbor Hospital and the Department of Health and Human Services[5] (DHHS) covering the time period from July 1, 2007 to June 30, 2010. (Supp. S.M.F. ¶ 7.) The defendants nevertheless argue that there was an implied contract between Spring Harbor and DHHS. Defendants rely on Nightingale v. Leach to argue there is no effective difference between an express contract and an implied-in-fact contract. Nightingale v. Leach, 2004 ME 22, ¶ 4, 842 A.2d 1277.

Although defendants have failed to produce a signed written contract between DHHS and Spring Harbor for the time period relevant to this case, they have produced contracts covering other time periods. They offer a signed contract that was in effect between 7/6/05 and 6/30/06 and two unsigned versions of contracts that would have covered 7/1/07 to 6/30/10. (Supp. S.M.F. ¶¶ 2, 7.) Defendants also offer the current contract between DHHS and Spring Harbor, effective between 7/1/12 and 6/30/14. (Supp. S.M.F. ¶ 9.) The terms of all of these contracts differ considerably.

The President and Chief Executive Officer of Spring Harbor Hospital, Dennis King, believes since May 2005 there has been an understanding, which has not changed substantially, regarding Spring Harbor Hospital's acceptance

---

[4] Plaintiffs do not address defendants' arguments regarding discretionary functions and insurance. (Defs.' Brief 11-18.)

[5] The "department" referenced in 34-B M.R.S. § 3861 is the Department of Health and Human Services. See 34-B M.R.S. § 3861(1)(D).

11

and treatment of patients who are involuntarily committed. (Supp. S.M.F. ¶ 5.) The plaintiffs correctly note that the cited reference, Mr. King's affidavit, supports the fact that Mr. King believes there has been an understanding; the affidavit does not support the statement of fact that "[s]ince at least May 2005, the understanding and agreement between Spring Harbor Hospital and the Department of Health and Human Services, pertaining to Spring Harbor's acceptance and treatment of patients who require involuntary admission and commitment, has not changed substantially." (Rep. S.M.F. ¶ 5.) Defendants also rely on an email and "allocation letter" from a representative at DHHS sent to Spring Harbor on 6/8/10 to inform the hospital that it was "time to renew your agreement with the department." (Supp. S.M.F. ¶ 8.)

The existence of a contract is generally a question for the jury. Sullivan v. Porter, 2004 ME 134, ¶ 13, 861 A.2d 625; see also Stanton v. Univ. of Me. Sys., 2001 ME 96, ¶ 12, 773 A.2d 1045 ("Whether a contract, express or implied, exists is a question of fact."); Agway, Inc. v. Ernst, 394 A.2d 774, 777 (Me. 1978) ("The existence of an agreement, involving as it does so intricately the conduct of the parties, is appropriately a question for the trier of fact."). In Stanton, the Law Court articulated the requirements for proving an implied contract:

> To establish a legally binding agreement the parties must have mutually assented to be bound by all its material terms; the assent must be manifested in the contract, either expressly or impliedly; and the contract must be sufficiently definite to enable the court to determine its exact meaning and fix exactly the legal liabilities of the parties. For a contract to be enforceable, the parties thereto must have a distinct and common intention which is communicated by each party to the other.

Stanton, 2001 ME 96, ¶ 13, 773 A.2d 1045 (internal citations and quotations omitted). Although the defendants have submitted evidence that Spring Harbor believed a contract was in effect, the only evidence the DHHS believed a contract

12

was in effect is the email and letter with the "time to renew" language. This evidence is insufficient to establish conclusively the existence of a contract. The jury must decide whether a contract between DHHS and Spring Harbor existed during the time period relevant to this case.

5. Terms of the Contract

Even if there was an implied contract, defendants concede that the terms of the contract are uncertain. The defendants argue, however, that although the terms of the contract are uncertain, the precise terms are not material to finding immunity in this case. (Defs.' Reply Brief, page 5). Under 34-B M.R.S. § 3861, emergency involuntary commitments are not limited to hospitals that have contracted with DHHS. See 34-B M.R.S. § 3861(1) (referring to nonstate mental health institutions as opposed to designated nonstate mental health institutions). Immunity, on the other hand, is limited to such hospitals that are taking patients "under a contract" with DHHS. See 34-B M.R.S. § 3861(1)(A). Thus, the statute contemplates a scenario in which a nonstate hospital with no contract with DHHS could involuntarily commit a patient. See Lever 2004 ME 35, ¶ 18, 845 A.2d 1178 (discussing the legislative history of the immunity statute and concluding that it was enacted to "expand[] the ability of private hospitals to accept involuntarily committed patients"). Thus, even if Spring Harbor had a contract with DHHS, it is not certain that Ms. Fecteau was admitted pursuant to that contract. The circumstances surrounding Ms. Fecteau's involuntary commitment make the precise terms of the contract relevant in this case.

There are issues of material fact regarding the terms of any contract between Spring Harbor and DHHS. For example, one of the unsigned 2007 contracts provides: "The Department will reimburse the Provider for all mental

13

health and substance abuse treatment services provided by the Hospital to Authorized Clients during an Episode of Care." (Opp. S.M.F. ¶ 102.) Ms. Fecteau was initially voluntarily admitted to Spring Harbor. (Opp. S.M.F. ¶ 43.) Payment was authorized by her CIGNA health insurance. (Opp. S.M.F. ¶ 45.) The record does not reflect whether DHHS was billed for Ms. Fecteau's care or whether Spring Harbor was reimbursed for that care.

6. State Action

The plaintiffs argue there is insufficient state action in this case on which to base immunity. They rely in part on the Superior Court case Saunders v. Tisher (Penobscot County, *Hjelm, J.*), in which the court found "that a private physician who participates in the process of involuntarily committing a person to a psychiatric hospital and participates in that person's resulting confinement at the private hospital does not act under color of law." Saunders v. Tisher, 2005 Me. Super. LEXIS 197, *24-25 (Mar. 28, 2005) aff'd on other grounds, 2006 ME 94, 902 A.2d 830. The Saunders court pointed out, however, that whether a private party is a state actor for the purposes of a federal claim presents a different legal question than whether that party is entitled to civil immunity under state law:

> The enactment of section 3861(1)(A) appears to have resulted from a legislative recognition that physicians' commitment assessments and decisions should not be influenced by the prospect of civil liability. Such a conclusion, however, should not be mistaken for a determination that, under a different set of legal principles, such physicians in fact act under color of law when they make those kinds of assessments and decisions.

Id. at *22-23 (internal citations omitted). Thus, whether Spring Harbor is a state actor for purposes of federal law is, in this instance, inapposite to whether it has civil immunity under state law.

14

The plaintiffs next argue that it would be unconstitutional to extend immunity to Spring Harbor. Plaintiffs first argue a broad reading of immunity here would violate their due process rights. Pursuit of a negligence claim is not a fundamental right. Me. Med. Ctr. v. Cote, 577 A.2d 1173, 1177 (Me. 1990). Accordingly, extending immunity to private hospitals that accept involuntarily committed patients under a contract with DHHS is subject to rational basis review. See State v. Haskell, 2008 ME 82, ¶ 5, 955 A.2d 737. The purpose of the law in part was to encourage private hospitals to accept involuntarily committed patients in an effort to provide better care and reduce the burden on public hospitals for these patients. A rational basis supports the legislation that provides immunity to these private hospitals in certain cases involving involuntary commitments.

Plaintiffs' second constitutional argument is that, if applied to this case, 34-B M.R.S. § 3861 would violate the open courts provision of the Maine Constitution. Article I Section 19 of the Maine Constitution provides: "Every person, for an injury inflicted on the person or the person's reputation, property or immunities, shall have remedy by due course of law; and right and justice shall be administered freely and without sale, completely and without denial, promptly and without delay." The Law Court, however, has never held that abolishing a cause of action violates this provision of the Maine Constitution. To find otherwise would invalidate legislative action extending immunity to private actors in many settings. See, e.g., 24 M.R.S. § 2904 (2013) (extending immunity to healthcare professionals who volunteer for nonprofit organizations); 7 M.R.S. § 4018 (2013) (extending immunity to veterinarians who report suspected animal cruelty); 14 M.R.S. § 159-A (2013) (limiting liability of landowners who allow the

15

public to use their land for recreation). The open courts provision in the Maine Constitution has never been interpreted as preventing the legislature from limiting a cause of action. In this case, therefore, 34-B M.R.S. § 3861 is a valid legislative enactment.

The entry is

The Defendants' Motion for Summary Judgment is DENIED.

Date: February 28, 2014

Nancy Mills
Justice, Superior Court

16

CUMBERLAND COUNTY'S CLERK'S OFFICE
CIVIL-REAL ESTATE DIVISION
205 NEWBURY ST
PO BOX 412
PORTLAND ME 04112

JULIAN SWEET ESQ
BERMAN & SIMMONS
PO BOX 961
LEWISTON ME 04243-0961

MARK LAVOIE ESQ
NORMAN HANSON & DETROY
PO BOX 4600
PORTLAND ME 04112-4600

CUMBERLAND COUNTY'S CLERK'S OFFICE
CIVIL-REAL ESTATE DIVISION
205 NEWBURY ST
PO BOX 412
PORTLAND ME 04112